NORTHERN ILLINOIS GAS COMPANY, Plaintiff-Appellant and Counter-
defendant-Appellee, v. VINCENT DiVITO CONSTRUCTION *et al.*, Defend-
ants-Appellees and Counterplaintiffs-Appellants.

Second District   No. 2—90—1050

Opinion filed May 24, 1991.

REINHARD, P.J., concurring in part and dissenting in part.

W.H. Major, Jr., and Laurence Leszcynski, both of Major, Fennell & Associates, Ltd., of Wheaton, for appellant.

John B. Kincaid, of Mirabella & Kincaid, of Wheaton, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, Northern Illinois Gas Company (Northern Illinois), filed a six-count complaint against defendants, Vincent DiVito Construction and Vincent DiVito individually, alleging negligence and trespass arising out of three separate incidents in which DiVito damaged Northern Illinois' service lines. DiVito filed a counterclaim against Northern Illinois, alleging that, as to one of the incidents, Northern Illinois was negligent in maintaining, constructing, burying, protecting and warning others of the close proximity of the gas main to the surface of the street. The trial court granted a directed finding for DiVito on Northern Illinois' complaint and entered judgment against Northern Illinois on DiVito's counterclaim in the sum of $470.21. Northern Illinois timely appeals raising the following issues: (1) whether the trial court failed properly to consider plaintiff's exhibits Nos. 1 and 2 as evidence of damages when granting a directed finding for DiVito; (2) whether the trial court erred in striking the testimony of one of Northern Illinois' witnesses; (3) whether the trial court erred in denying Northern Illinois' attempts to refresh a witness' memory; (4) whether the trial court erred in denying Northern Illinois' motion for a directed finding on DiVito's counterclaim; (5) whether the trial court abused its discretion in sustaining DiVito's objection to the inquiry of a damage clause in the contract between DiVito and its general contractor; and (6) whether the trial court erred in granting judgment in favor of DiVito in the amount of $470.21. We affirm in part and reverse in part.

Northern Illinois Gas Company is an Illinois corporation engaged in the business of providing residential and commercial natural gas service. Vincent DiVito Construction is engaged in the business of installing sewers and mains and backhoeing. In its complaint, Northern Illinois alleged three incidents of negligence. First, it alleged that on

April 12, 1988, DiVito was installing a sewer line at 3602 Walters in Northbrook, Illinois, when it negligently damaged a Northern Illinois gas line. Second, it alleged that on July 13, 1988, DiVito was engaged in its business of backhoeing at 500 Ogden in Western Springs, Illinois, when it negligently damaged a Northern Illinois gas line. Third, Northern Illinois alleged that on September 8, 1988, DiVito was engaged in its business of water main installation at 501 N. Main, Glen Ellyn, Illinois, when it negligently damaged a Northern Illinois gas line. Northern Illinois also alleged trespass in each of the three incidents and sought a total of $9,198.32 in damages.

In its answer to the complaint, DiVito admitted that it negligently damaged the gas line in Northbrook on April 12, 1988; however, it denied its negligence as to the other two incidents. DiVito further alleged, by way of counterclaim, that Northern Illinois was negligent with regard to the Glen Ellyn gas line. DiVito alleged that the gas main was lying only inches below the existing concrete base, contrary to regulations promulgated by the Interstate Commerce Commission, the Village of Glen Ellyn, and the State of Illinois. DiVito alleged that, as a direct and proximate result of the careless and negligent conduct of Northern Illinois, DiVito was caused to experience considerable delay while the gas main was repaired, resulting in monetary loss and damage to DiVito in the payment of labor and equipment costs totalling $1,406.53.

A bench trial was subsequently held. Hugo Danoto was the first witness to testify on behalf of Northern Illinois. Danoto testified that he is a systems protection supervisor for Northern Illinois. Danoto stated that he is familiar with the incident that occurred at 3602 Walters in Northbrook, Illinois, on April 12, 1988. Danoto explained that a five-eighths-inch plastic gas line was struck by DiVito, whereupon a crew was dispatched to the scene. Danoto met the crew at the scene. Danoto testified that he was responsible for completing the accident report, which was made in the usual course of business. Danoto stated that the accident report contains the names of the contractors and the people who were involved in the incident, the names of the service people and street department people who went out to make the repairs and the amount of time they spent there, and the name of the supervisor completing the report.

Danoto stated that a three-man crew from the street department, along with one customer service technician, was sent to the Northbrook site. Danoto testified that the three-man crew spent a total of 4.5 man-hours repairing the gas line at a charge of $40.80 per hour. The customer service technician spent .7 hours at $37 per hour.

Thus, the total charge for labor was $209.50. In making the repairs, the crew used five feet of five-eighths-inch plastic, at a cost of $1.75, and two normacs, at $12.28. Danoto recalled that four vehicles were used that day in repairing the line, including a backhoe, a street truck, and a truck to carry the tools. When Danoto could not remember the charges for the transportation, he was permitted to refresh his recollection with the accident report he prepared concerning the incident. Danoto testified to the amount of time each vehicle was used, its classification, and the hourly rate. The total cost for the transportation and equipment was $32.48. Thus, the total charge for damages to the Northbrook site was $256.01. The accident report to which Danoto referred throughout his testimony was admitted as plaintiff's exhibit No. 1, over the objection of DiVito.

On cross-examination, Danoto stated that he did not know how much the crewmen or the service technician was paid for the Northbrook call. Danoto testified that the labor rate indicated on the accident report is the rate Northern Illinois charges for emergency situations. Danoto did not know how that rate was chosen, nor did he know how the hourly rates for the vehicles were chosen; Danoto explained that the rates were probably set by the general office.

Lyndall Schoenbeck, another employee of Northern Illinois, was the next witness to testify. He stated that on April 12, 1988, he got a call about broken gas service at 3602 Walters in Northbrook and responded. Schoenbeck stated that when he arrived at the scene, he shut the gas main off at the house and installed a dust cap at the break in the line. Schoenbeck stated that he then called the maintenance department to have a crew sent out to the site.

The next witness, Jack Haley, testified about the incident in Western Springs. Haley, a construction and maintenance supervisor for Northern Illinois, stated that on July 13, 1988, he was alerted by a call on his radio that a contractor had hit a service line at 500 Ogden Avenue in Western Springs, causing a gas leak. When he arrived at the site, Haley smelled a strong odor of gas coming out of the ground at Ogden Avenue. He saw a machine that DiVito's workers were digging with on the north side of Ogden Avenue and a box used to protect the workers. Haley explained that the hole dug by the workers was approximately 15 or 20 feet deep and the box was located inside the hole underneath a portion of the gas line that had kinked. The gas line was on the west side of the box running in the ground. The box itself was approximately 10 feet high, 20 feet long, and 8 feet wide. Haley testified that when he arrived the northwest

corner of the box was in contact with the gas line where it was kinked.

Haley testified that initially a three-man crew was called to locate the source of the leak and, later, an additional two-man crew was called. Haley testified that in order to find the source of the leak, it was necessary to physically use a shovel, a spade, and a backhoe. It was discovered that the gas line was pulled apart at a compression sleeve, so they crimped the pipe at that point to slow the flow of gas. They then went to the other side of the street and put a stopper on the pipe. Haley testified that he spoke with Angelo DiVito, who acknowledged the damage to the gas line and stated that the construction company would be coming close to or damaging the line in completing the installation of the sewer. Consequently, Haley decided to run a temporary line for service until the sewer was completely laid. The temporary line consisted of 700 feet of five-eighths-inch plastic pipe, 1¼-inch sleeve, and a drill T.

Haley testified that he keeps track of the hours and the costs of repairs. Haley testified that he prepared an accident report on the July 13, 1988, incident at Western Springs. The report was admitted into evidence as plaintiff's exhibit No. 2. The report indicated that there were five crewmen at the site and a total of 56 man-hours were expended at a rate of $40.80 per hour, for a total of $2,284.80 in labor costs. Haley indicated that there were five vehicles at the site for a total of 56 hours. He noted the differing rates and explained that the rate depended upon the type of vehicle. The total charge for transportation and equipment was $354.20. Haley noted the charges for the materials included $26.75 for the stopper, $19.78 for the sleeve, and $38.43 for 21 feet of cast iron pipe. Thus, the total emergency charges for the labor, transportation and materials equalled $2,723.96. Haley noted that there were no charges assessed for the 700-foot temporary line, or for the two subsequent visits that resulted when DiVito's machine ran over the temporary line and cut it, or for the subsequent installation of the permanent 700-foot line. Haley testified that he took pictures of the site on July 13, 1988, and two pictures were admitted as plaintiff's exhibits Nos. 2 and 3. The pictures depicted the ditch made by DiVito for the sewer, the Northern Illinois gas line, the kink in the gas line, and the box used by DiVito's workers.

On cross-examination, Haley explained that the emergency charges did not include the cost of the 700-foot temporary line; however, it did include the time involved in installing the line. Haley was then questioned about the labor charges. He admitted that he did not

know how the charge of $40.80 per man-hour was set and that it was probably set by someone in the office. Haley did not know how much the crewmen were paid per hour. He stated that based upon his experience and best recollection, three of the five men were paid between $12 to $15 per hour. Haley admitted that the rates charged for the transportation and equipment were also set by someone in the office.

Haley admitted that it was possible that the line could have been permanently repaired on July 13, 1988, if the contractor would have been willing to shut down; thus, the temporary line would have been unnecessary. To permanently install the pipe would have taken approximately half the time. Haley further conceded that he could have used less than 700 feet of plastic pipe. He testified that probably a total of 12 feet of steel pipe could have been used.

Haley testified that he was present when the repairs were made even though he was not there every minute of the day. He then admitted that he left the site after the gas line was made safe but probably stopped by during the day when the repairs were being made. Defense counsel then confronted Haley with a deposition he had given earlier wherein Haley stated that he was not present all the time until the gas was made safe. In the deposition Haley stated that, once the gas was made safe, he probably had other things to do during the day and was not present when the temporary line was installed.

Haley admitted, over the objection of Northern Illinois' counsel, that he had testified from reports as far as materials and time. The trial judge then struck Haley's testimony regarding all events occurring after the gas line was made safe. The judge explained that Haley was not present after that point in time to observe the events to which he testified.

On redirect examination, Haley testified that some of the information contained in the accident report was made from personal observation. He stated that he told the crews what to do and how to do it.

The next witness to testify was Steven Gidley, the resident engineer of James J. Bennis and Associates. The Village of Western Springs awarded his company the construction project for the 500 block of Ogden Avenue. The project involved the design of a sewer and the field inspection of the construction. In preparing the blueprints, atlases supplied by Northern Illinois were utilized. Gidley testified that the location of the gas main as indicated on the atlases was not exactly correct. The blueprints, which were to be followed

by DiVito, were admitted into evidence as plaintiff's group exhibit No. 5. The general notes at the front of the engineering drawings indicated that the location of the utilities shown on the plans are approximate and the contractor is responsible to verify the exact location of the utilities.

Gidley testified that there was a JULIE meet prior to the construction of the project. Gidley defined the meet as a joint meeting of all the utility companies who typically have underground facilities so that the locations of the utilities can be verified before digging starts. Representatives from DiVito and Northern Illinois were present at the meeting. Northern Illinois made no indication to DiVito that there might be a problem with DiVito's workers coming in contact with the gas company lines.

Gidley testified that in order for DiVito to change direction of its sewer line, it would have to first come to Gidley or his company for permission to do so. Gidley testified that he did not give DiVito the right to deviate from the plans, and DiVito reasonably complied with the plans.

Joseph Brunory was the next witness to testify. Brunory is a distribution technician for Northern Illinois. He testified that he was part of the second crew to arrive at the Western Springs site on July 13, 1988. Brunory testified that there were five crewmen at the site for a total of 56 man-hours. There were five vehicles including two street trucks, two backhoes and one dump truck. The equipment was on the site for a total of 56 hours also. Brunory stated that he was at the jobsite the entire time, and he listed the materials used to effectuate the repairs. Brunory testified that they laid a 700-foot temporary line and that they showed a DiVito worker where the line was. Nonetheless, the line was subsequently damaged twice by DiVito in the two weeks that followed.

On cross-examination, Brunory stated that he did not make the report about the Western Springs incident; however, he probably recorded it in his diary. He admitted that he looked at the accident report prepared on the incident prior to testifying. Brunory stated that, given the amount of time he spent there and his past experience, 56 hours was probably an accurate figure.

The next witness, Charles Starks, testified about the incident occurring at 501 North Main Street in Glen Ellyn on September 8, 1988. Starks is a distribution technician for Northern Illinois. He was called to Glen Ellyn to repair a service that was hit. Starks stated that, when he arrived at the scene, 26 inches of the gas line were ex-

posed. He said that to make the necessary repairs, they had to stop the gas and replace 45 feet of two-inch pipe.

Starks testified that five crewmen were at the site along with various other representatives from the gas company. Starks testified that his memory was exhausted as to the number of man-hours expended in making the repairs. The accident report prepared by Starks on the incident was introduced as plaintiff's exhibit No. 6. Starks testified that the report did not refresh his memory. Starks stated that he did not fill out the back part of the report where the man-hours, transportation, and labor costs are listed.

Phillip Jungles, another employee for Northern Illinois, was also called to the Glen Ellyn site. He stated that when he arrived, he observed that the service was pulled up out of its ditch and the pipe was kinked in a U shape. Jungles noted that the marks indicating the location of the pipes were correct. In making the repairs, the service had to be replaced under the road from the main to the proper line.

Jungles testified that he did not know the exact number of man-hours required to make the repairs or the equipment that was used. Jungles stated that the accident report and the bills for damages would refresh his memory. When counsel for Northern Illinois attempted to show Jungles the report, which had previously been marked as plaintiff's exhibit No. 6, DiVito's counsel objected on the basis that Jungles had not prepared the document. Jungles responded that he compares the bills with the information contained on the front and back of the accident report to check for accuracy. Specifically, Jungles checks the man-hours involved, the different departments, and the vehicles utilized. Jungles stated that he does this in the normal and usual course of his business. Jungles testified that he initialed the front of the accident report and indicated the depth of the facilities before the cut, the depth of the contractor's cut, and the depth of the facilities below the pavement or curb. The bills for the damages to Northern Illinois' facilities at Northbrook, Western Springs, and Glen Ellyn were marked as plaintiff's exhibits Nos. 7, 8 and 9, respectively.

Counsel for Northern Illinois then attempted to refresh Jungles' memory as to the man-hours expended. Defense counsel objected, and the trial court sustained the objection, finding that Jungles did not know how many man-hours were expended and, if allowed, his testimony would be based upon double hearsay.

Kenneth Palmatier, a supervisor of claims at Northern Illinois, testified as to the bills for damages sent to DiVito in all three inci-

dents. Plaintiff's exhibit No. 7 was the bill sent for the damages occurring April 12, 1988, at Northbrook. Plaintiff's exhibit No. 8 was for the damages at Western Springs on July 13, 1988, and plaintiff's exhibit No. 9 was for the damages at Glen Ellyn on September 9, 1988. The trial judge would not permit Palmatier to testify as to the total amount of each bill, or to the breakdown of charges.

The trial court denied the request of Northern Illinois' counsel to admit plaintiff's exhibit No. 6, which was the accident report prepared on the Glen Ellyn incident. The judge noted that there was no testimony indicating the source of the figures contained in the document. The judge explained that Mr. Starks, the preparer of the document, testified that it did not refresh his memory and Mr. Jungles could not testify as to the accuracy of the figures; rather, he could only state that the figures were consistent with the bills.

Northern Illinois then rested, and DiVito made a motion for a directed finding. The trial judge granted a directed finding in favor of DiVito as to all counts in the complaint. The judge found that Northern Illinois failed to show the fair and reasonable costs of the damages sustained.

DiVito then proceeded with testimony regarding its counterclaim. The first witness called was Robert Madden, who is the project manager and field coordinator for Thomas Madden Construction Company. Madden testified that in the summer of 1988, Madden Construction Company was the general contractor for a project on Hill Avenue in Glen Ellyn. DiVito was the subcontractor who handled all the sewer work west of Main Street. Prior to construction, Madden and DiVito attended a meeting, at which Mr. Jungles was present on behalf of Northern Illinois. A discussion was had as to potential conflicts with the gas main. Madden explained that the plans indicated the location of the mains, but not the services. It was agreed that, if the services were in conflict with the construction, the services would be moved. Madden explained that a potential conflict would be vertical such that if the gas line was high enough to be in the new pavement or the subgrade, it would be moved. Madden testified that in order to put the street in, there was a minimum depth of 10 inches, plus four inches of stone subbase. In addition, they could be required to go another two or three feet depending on the ground. Madden testified that a gas line located immediately beneath the pavement would have to be removed because it would be in conflict with the pavement of the subgrade where they had to excavate.

On cross-examination, Northern Illinois' counsel asked Madden whether the contract between Madden as general contractor and

DiVito as subcontractor provided for any damages for downtime that resulted from utilities being struck. DiVito's counsel objected, and the objection was sustained. The trial court held that, unless Northern Illinois was a party to the contract, any rights created by the contract would not be enforceable by Northern Illinois.

Vincent DiVito, Jr., was the next witness to testify. Vincent is the general superintendent of Vincent DiVito, Inc. He testified that DiVito did the sanitary sewer work, the water main construction, and the storm sewer work for Hill Avenue in Glen Ellyn. Vincent explained that Hill Avenue runs east and west. Vincent stated that prior to the time contact was made with the gas line, a DiVito employee hand dug on the south side of Hill Avenue, approximately 10 feet from where the crew was actually working. Vincent explained that they hand dig in order to locate the depth and location of the utility lines. Vincent testified that they located Northern Illinois' gas line, which was approximately 2 to 2½ feet deep. Vincent did not contemplate any contact between their backhoe and the gas line because he presumed that the gas line would be the same depth going across the road as it was on the parkway.

The operators were then instructed to proceed with their digging. When the backhoe dug seven to eight inches beneath the pavement, it struck the gas line, which was approximately 15 inches into the ground. Vincent testified that the machines were immediately shut down to avoid danger. Vincent testified that the operation remained shut down for three to four hours.

In determining the cost caused by the delay, Vincent recorded the hours the workers were idle. Vincent testified that there were five workers delayed and each worker made between $17 and $21 per hour. Vincent explained that the wages are established by a union. In addition to the hourly wages, Vincent testified that they were required to pay taxes and insurance at an undetermined amount. They were also required to pay pension and welfare benefits in the amount of $2 to $6 per hour for each employee. Vincent testified that the hourly cost of the backhoe used in the operation was approximately $100 per hour. He explained that this figure is based on rental book rate and standard rates established by the State of Illinois Department of Transportation. Vincent testified that a CAT endloader was also shut down, and the rate for it was approximately $85 per hour. Vincent testified that he calculated the resulting cost of the shut down by multiplying the number of hours involved in the delay by the hourly employee rates, by the pension and welfare rates, and

by the equipment rates. Vincent's calculations indicated that the total cost of the delay was $1,500.

On cross-examination, Vincent testified that the gas line was struck at approximately 9 or 9:30 a.m. and the workers did not go back to work until approximately 1 p.m. Vincent testified that the gas stopped blowing at 11 or 11:30 a.m., at which time there was no longer any danger to their equipment.

On redirect examination, Vincent testified that the elevation of the pipe from one side of the street to the other changed approximately 1½ feet. The change in elevation was caused by two elbows, which Northern Illinois did not warn DiVito had been placed there.

Ben DiVito was the last witness to testify on behalf of DiVito. Ben is president of DiVito, Inc. He testified that at the preconstruction meeting, Bob Madden noted the possible problem with the gas lines and asked Northern Illinois whether they wanted to go ahead of construction and relocate the lines or whether they wanted to do it during construction. Northern Illinois opted to do it during construction. Ben testified that there was no way one could precisely tell the depth of any gas line underneath the pavement.

Counsel for DiVito introduced counterplaintiff's exhibit No. 1, which was the bill sent to Northern Illinois for the delay caused to DiVito as a result of the gas line being struck. Ben testified that his brother Vincent prepared the bill, which noted the hours of the delay, the hourly rate each worker earned, the hourly rate for the equipment, and the amount of pension and welfare benefits. The trial judge admitted the document for the purpose of showing that the bill was sent and the amount of the above damages. However, it could not be admitted for the purpose of showing the amount of the taxes and insurance, although it could be admitted to show that those factors were included in the bill.

Counsel for DiVito rested, and Northern Illinois made a motion for a directed finding on the counterclaim. The motion was denied on the issue of liability. The motion was also denied as to damages incurred as a result of the labor costs and pension and welfare benefits. However, the trial court granted a directed finding as to the cost of the equipment, stating that DiVito had not established that the hourly rates charged were fair and reasonable. DiVito withdrew the request for insurance and taxes.

Northern Illinois then argued that Illinois law precludes recovery of economic losses in tort actions, citing *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. The trial court held

that *Moorman* applies only to product liability actions and ordered counsel to proceed with the defense of the counterclaim.

Ben DiVito was recalled by the defense as an adverse witness. Ben testified that he did not know the exact amounts that were paid into welfare and pensions. He stated that, if the laborers had been sent home when the gas line was damaged, the company would not have been obligated to pay them for the rest of the day.

Vincent DiVito was next recalled as an adverse witness. He testified that if the workers had hand dug closer to the curb, they probably would have discovered the elbow in the pipe which caused the change in elevation.

Bob Madden was also called as an adverse witness. He testified that his company broke up the concrete, and DiVito removed it. According to Madden, after the concrete was broken, DiVito could have safely pried up the concrete and hand located the gas lines.

Finally, the defense called Phillip Jungles. He testified that, from his observation, the original depth of the gas line was 26 to 28 inches. Jungles stated that there was no elbow or elevation between the point where the workers had hand dug and the point where the gas line was damaged. Jungles testified that while he was at the site, the DiVito workers were not idle. He stated that everyone appeared to be working.

After closing arguments were given, the trial court found in favor of DiVito and awarded it the natural and reasonable damages that flowed from the shutdown. The court found that amount to be $470.21, which included $387.61 for labor and $82.60 for pension and welfare benefits. Northern Illinois timely appeals.

Northern Illinois first argues that the trial court erred in failing to consider plaintiff's exhibits Nos. 1 and 2 as evidence of damages when granting a directed finding in favor of DiVito. Exhibits Nos. 1 and 2 were the accident reports prepared in the Northbrook and Western Springs incidents. They indicated the number of man-hours involved in making the repairs, the hourly rates charged for the labor, the type of equipment involved, the hourly rates for the equipment, and the cost of the materials.

In granting the motion for a directed finding, the trial court stated that Northern Illinois failed to show the fair and reasonable costs of the damages sustained. On appeal, Northern Illinois contends that, in so ruling, the trial court failed to take any consideration of the exhibits.

■ We note that the purpose of awarding compensatory damages is to make the injured party whole, not to punish the defendant

or bestow a windfall upon the plaintiff. (*Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 818.) The standard for the assessment of damages for injury to personal property, if it is repairable, is the reasonable cost of repairs; the trial court is not required to calculate the amount of damages at the highest possible cost but only at a "reasonable cost." (*Wall v. Amoco Oil Co.* (1981), 92 Ill. App. 3d 921, 924.) We agree with the trial court that there was no evidence presented as to the fair and reasonable costs of the damages sustained. The only evidence presented was the amount Northern Illinois charged for the repairs, and there was no testimony explaining how the hourly rates used in calculating those charges were set. Thus, there was no evidence indicating that Northern Illinois' charges reflected the reasonable cost of the repairs. See *Chicago City Ry. Co. v. Wall* (1900), 93 Ill. App. 411, 416.

Next, Northern Illinois contends that the trial court erred in striking a portion of Jack Haley's testimony. In support, Northern Illinois makes two arguments: first, it argues that the witness' testimony was not improper; second, it contends that the witness was not properly impeached.

In striking a portion of Haley's testimony, the trial court held that testimony to events which Haley did not observe was improper. Haley admittedly left the site after the gas line was made safe, and, thus, the trial court struck all subsequent testimony. We do not find this ruling to be in error. It is well settled that admissible testimony is limited to matters of which the witness has personal knowledge through his own senses. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §602, at 301 (5th ed. 1990).

Northern Illinois apparently argues that Haley's testimony was proper because it was, in part, based upon the accident report, which was prepared by him and admitted into evidence as a business record. We note Northern Illinois cites no authority in support of its proposition. The business records exception to the hearsay rule (134 Ill. 2d R. 236) makes it apparent that it is only the business record itself which is admissible, and not the testimony of a witness who makes reference to the record. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 727.) Thus, we conclude that the trial court properly excluded Haley's testimony as to the events he did not witness. Given our resolution of this issue, we need not consider Northern Illinois' claim that Haley's testimony could not be stricken on the basis of impeachment.

Next, Northern Illinois argues that the trial court erred in denying the gas company's attempt to refresh witness Phillip Jungles'

recollection with the accident report prepared on the Glen Ellyn incident. Jungles testified that he did not know the exact number of man-hours required to make the repairs at the site or the equipment that was used; however, the accident report and the bills for damages would refresh his memory. Jungles admitted that he did not prepare the report or the bills, but he did compare the bills with the information contained on the report to check for accuracy. The trial court would not allow the witness' memory to be refreshed with either document.

■ When a witness has no independent recollection of facts within his knowledge, the witness may be permitted to refresh his memory by the use of a writing, even though the writing is not prepared by the witness, provided the witness can, after inspecting the writing, speak to the facts from his own recollection. (*Dexheimer v. Industrial Comm'n* (1990), 202 Ill. App. 3d 437, 440; *People v. Cross* (1981), 100 Ill. App. 3d 83, 88.) Here, the facts sought to be recalled were never within the witness' personal knowledge. Rather, he learned of these facts through comparing two hearsay documents. Consequently, even if the witness had been allowed to inspect the documents, he would have been unable to state the facts from his own personal knowledge. Thus, we find that the trial court properly excluded his testimony.

We next consider Northern Illinois' contention that the trial court erred in refusing to direct a finding in its favor following DiVito's presentation of evidence on its counterclaim. Specifically, Northern Illinois argues that the trial court erred in finding that economic damages are recoverable in a negligence case. Northern Illinois contends that in so ruling the trial court limited the holding in *Moorman Manufacturing Co. v. National Tank Co.* to strict liability cases.

In denying Northern Illinois' motion for a directed finding, the trial court distinguished *Moorman* by stating:

> "I believe that [*Moorman*], the case that [Northern Illinois has] cited is strictly a product liability based on misrepresentation as to the qualities and for lack of a better terms [*sic*], just the quality of the product."

Thus, contrary to what Northern Illinois argues, the trial court did not distinguish *Moorman* on the basis that its holding was limited to strict liability cases; rather, it distinguished it based on the fact that it involved a products liability action.

We find that the trial court's ruling was incorrect. In *Moorman*, the plaintiff had purchased a grain-storage tank from the defendant manufacturer. A crack developed in the tank some years later, and

the plaintiff sued the manufacturer, seeking damages for the cost of repairing the tank and for the loss of its use. The supreme court held that a products liability plaintiff cannot recover solely economic losses under the tort theories of strict liability, negligence, and innocent misrepresentation. (*Moorman*, 91 Ill. 2d at 91.) "Economic loss" was defined as those damages sought for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property. (*Moorman*, 91 Ill. 2d at 82.) The court determined that the losses the plaintiff sought to recover resulted solely from its disappointed commercial expectations and thus plaintiff's remedy must lie under the warranty provisions of the Uniform Commercial Code. (*Moorman*, 91 Ill. 2d at 91-92.) However, the court's ruling was not conditioned on whether a warranty remedy was in fact available, as the court held that the plaintiff's claim for breach of express warranty was barred by the statute of limitations. *Moorman*, 91 Ill. 2d at 94; see also *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 153.

The holding in *Moorman* has subsequently been extended beyond product liability cases to include cases of professional malpractice. (*2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, 316-17; *Collins v. Reynard* (1990), 195 Ill. App. 3d 1067, 1072.) Additionally, the *Moorman* holding has been applied to a case with facts similar to the case at bar. In *Dundee Cement Co. v. Chemical Laboratories, Inc.* (7th Cir. 1983), 712 F.2d 1166, a truck owned by the defendant overturned on United States Route 83 in Lemont, Illinois. The truck carried a flammable liquid that spilled onto the road as a result of the accident. Although the liquid did not ignite, State highway officials closed the road for more than five hours. The plaintiff owned a business whose sole access road connected with the part of Route 83 that was closed after the accident. The plaintiff alleged in a negligence suit that it lost at least $29,595.02 in business because of customers who could not reach its premises while the road was closed. None of the liquid spilled onto the plaintiff's property or physically damaged it. *Dundee Cement*, 712 F.2d at 1167.

Relying on *Moorman*, the court in *Dundee Cement* held that purely economic losses are not recoverable in a negligence action. The court noted that the plaintiff's claim was even less meritorious than *Moorman* because the plaintiff in *Dundee Cement* did not even have an ownership interest in the public road, unlike *Moorman*, where the plaintiff at least owned the defective grain-storage tank.

(*Dundee Cement,* 712 F.2d at 1170.) In rejecting the plaintiff's argument that Illinois permits recovery for lost profits where the losses are proved and shown to be proximately caused by the defendant's tortious conduct, the court stated that the award of lost profits is allowed only in limited circumstances, specifically: when the defendant has intentionally harmed the plaintiff or when the plaintiff or his property is physically harmed. *Dundee Cement,* 712 F.2d at 1170.

DiVito argues that economic damages are recoverable on its counterclaim because the claim falls within an exception to *Moorman.* Specifically, DiVito argues, where the damage is the result of a sudden and dangerous occurrence, the doctrine of exclusion does not apply. DiVito relies on *Schuster Equipment Co. v. Design Electric Services, Inc.* (1990), 197 Ill. App. 3d 566. In *Schuster Equipment,* the plaintiff filed a complaint against the defendant alleging that the defendant had negligently constructed and installed an electric service line to the plaintiff's office. The complaint alleged that the defendant's negligence resulted in a fire inside the plaintiff's personal computer, which was destroyed. The defendant filed a motion to dismiss the complaint arguing that the damages the plaintiff sustained were economic losses, which are not recoverable under the authority of *Moorman.* The plaintiff argued that the destruction of the computer was due to a "sudden and violent occurrence" and that the damage to the computer was property damage, not an economic loss. The trial court granted the motion to dismiss, and the plaintiff appealed.

The appellate court reversed the trial court's dismissal of the complaint. In doing so, the appellate court noted that the plaintiff's complaint alleged that there was damage to other property, its computer, and that the damage was the result of a sudden and dangerous occurrence, a fire. Consequently, the court held that the plaintiff sufficiently alleged grounds for recovery under *Moorman. Schuster,* 197 Ill. App. 3d at 570.

■ Rather than supporting DiVito's position, we find that the holding in *Schuster* demonstrates that the "sudden and dangerous occurrence" argument is not an exception to *Moorman* but rather is a part of its holding. The supreme court in *Moorman* stated that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence." (*Moorman,* 91 Ill. 2d at 86; *Oldenburg v. Hagemann* (1987), 159 Ill. App. 3d 631, 642.) In *Schuster,* the plaintiff alleged that the property damage resulted from a sudden or dangerous occurrence. Here, DiVito has not alleged that it suffered personal injury or property damage.

Thus, its claim on appeal that the damages resulted from a sudden or dangerous occurrence is insufficient.

We find *Moorman* to be controlling and hold that the trial court erred in failing to direct a finding in favor of Northern Illinois. Consequently, we reverse the trial court's order denying the motion. Given our holding, we need not address the remaining issues raised on appeal.

For the above-stated reasons, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

UNVERZAGT, J., concurs.

PRESIDING JUSTICE REINHARD, concurring in part and dissenting in part:

Because I agree that plaintiff (Northern Illinois) failed to prove the reasonableness of the rates it ascribed to the repair work at issue, I concur in the majority's affirmance of the judgment in favor of defendants (collectively DiVito) on Northern Illinois' complaint. I disagree, however, with the majority's analysis of the applicability of *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, in the instant case, and so I dissent from the reversal of the award in favor of DiVito on their counterclaim.

*Moorman* struggled with the question of whether and under what circumstances a tort action should be foreclosed in favor of limiting a plaintiff's recourse to solely contractual remedies. *Moorman* established that, in a product liability action, recovery may not be had in tort for solely economic losses regardless of whether the action is brought under a theory of strict liability or negligence. (*Moorman*, 91 Ill. 2d at 81, 88.) The supreme court excepted only two varieties of tort actions from the sweep of this holding: (1) intentional misrepresentation; and (2) negligent misrepresentation by one who is in the business of supplying information for the guidance of others in their business transactions. *Moorman*, 91 Ill. 2d at 88-89.

As the majority correctly notes, *Moorman* has been applied outside of the product liability setting. I do not believe, however, that the case law in this area supports the application of *Moorman* outside the sphere of product liability where the allegedly negligent actions of the defendant were not undertaken pursuant to a contractual agreement or relationship. Close examination of the supreme court's recent decision in *2314 Lincoln Park West Condominium As-*

*sociation v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, makes clear that *Moorman's* economic loss rule is rooted in the question of whether a defendant's duty will be defined as contractual in nature or based in tort.

The plaintiff in *Lincoln Park West* was a condominium owners association which brought an action to recover for defects in the construction of the condominium complex against, *inter alia*, the architectural firm which designed the complex pursuant to a contract with the original owner. (*Lincoln Park West*, 136 Ill. 2d at 304-06.) The defendants, citing *Moorman*, filed a motion to dismiss the plaintiff's complaint insofar as it sought to recover solely economic losses based on a negligence theory. The trial court granted the motion in part but refused to strike the negligence count directed against the architect. The trial court certified the question of whether there should be "an exception to the rule set forth in *Moorman* which would permit Plaintiffs seeking to recover purely economic losses due to defeated expectations of a commercial bargain to recover from an architect or engineer in tort." *Lincoln Park West*, 136 Ill. 2d at 306.

In analyzing *Moorman's* economic loss rule, the supreme court in *Lincoln Park West* stated that "the concept of duty is at the heart of the distinction drawn by the economic loss rule" and that "the economic loss rule attempts to define the contours of duty." (*Lincoln Park West*, 136 Ill. 2d at 314-15.) The court held that the association's claim concerned the quality, rather than the safety, of the building and was thus more appropriately resolved under contract law. The following statement is of particular note:

> "The architect's responsibility originated in its contract with the original owner, and in these circumstances its duties should be measured accordingly." (*Lincoln Park West*, 136 Ill. 2d at 317.)

Thus, the court determined that the association could not recover in tort because it was merely attempting to obtain the benefit of its bargain.

The majority correctly notes that the supreme court has held that the applicability of the *Moorman* economic loss rule is not dependent upon whether there is a contract remedy available to the plaintiff. The supreme court's most specific pronouncement on this point, however, does not suggest that *Moorman* applies even where the purportedly negligent conduct was not performed in the context of a contractual relationship. The court has stated:

> "A plaintiff seeking to recover purely economic losses *due to defeated expectations of a commercial bargain* cannot recover

in tort, regardless of the plaintiff's inability to recover under an action in contract." (Emphasis added.) (*Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 153.) Thus, while *Moorman* may apply where the plaintiff has no direct contractual relationship with the defendant (*Anderson*, 115 Ill. 2d at 148) or where the plaintiff's contractual claim is barred by the statute of limitations (*Moorman*, 91 Ill. 2d at 92-94), the supreme court has not applied *Moorman*'s economic loss rule to a situation where, like here, the purported act of negligence was not undertaken in the context of a contractual relationship with *any* party.

The majority cites three cases in support of its conclusion that *Moorman* has blanket application in any tort action. The first case, *Lincoln Park West*, as discussed above, clearly arises in a contractual setting. The second case, *Collins v. Reynard* (1990), 195 Ill. App. 3d 1067, applied *Moorman* to an action for legal malpractice, a result which is facially unacceptable because it would virtually eliminate legal malpractice as a cause of action. The supreme court has granted leave to appeal in *Collins*. (*Collins v. Reynard* (1990), 135 Ill. 2d 554 (No. 70325).) Moreover, the appellate court opinion in *Collins* appears to conflict with the supreme court's statement in *Lincoln Park West*:

"While we do not intend in the present case to determine the future application of *Moorman* in all areas of professional malpractice, we must reject the plaintiff's theory that denial of the negligence claim against the present architect would signal in general the end of malpractice recovery in tort. *** [S]ince *Moorman*, malpractice actions against attorneys have gone forward, without any suggestion that the form of recovery traditionally recognized in such actions would no longer be allowed. [Citations.] Moreover, those cases recognize *an extracontractual duty* not only to the client but also to the group of persons the client intended to benefit." (Emphasis added.) (*Lincoln Park West*, 136 Ill. 2d at 317-18.)

The clear suggestion in this passage is that *Moorman* does not apply to certain professional malpractice actions because the duty owed by such professionals is not defined solely by reference to the contractual relationship.

Finally, while I agree that the third case relied upon by the majority, *Dundee Cement Co. v. Chemical Laboratories, Inc.* (7th Cir. 1983), 712 F.2d 1166, holds that *Moorman* applies to every tort action, regardless of whether contractual duties are also involved, I feel the analysis in that case is not in accord with the Illinois Supreme Court's most recent pronouncements regarding the underlying

rationale for *Moorman*'s economic loss rule. As Federal decisions construing Illinois law are not binding on this court (*People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480, 484), I would not follow *Dundee Cement.*

In conclusion, I view the *Moorman* doctrine as simply an application of the general rule of tort law that, where a defendant's actions are undertaken pursuant to contract and cause only economic losses to the plaintiff, the defendant's duties are defined by the contract and are not imposed by tort law. (W. Keeton, Prosser & Keeton on Torts §92, at 655-67 (5th ed. 1984); see also Bertschy, *Negligent Performance of Service Contracts and the Economic Loss Doctrine*, 17 J. Marshall L. Rev. 249, 273 (1984) ("the economic loss doctrine should be held applicable to the negligence of any party who is performing a duty in which the plaintiff has a contractual expectation").) Accordingly, I dissent from the majority's application of *Moorman* to a negligence action where no contractual duties are involved.