ANN H. BEASLEY, Plaintiff-Appellee, v. EDDIE PELMORE, d/b/a Pelmore Construction Enterprises, Defendant-Appellant (Laborers' Local No. 703, Defendant; Auto-Owners Insurance Company, Intervenor).

Fourth District   No. 4—93—0517

Argued December 14, 1993.—Opinion filed March 3, 1994.

Michael E. Raub (argued), of Heyl, Royster, Voelker & Allen, of Urbana, for appellant.

Michael B. McClellan (argued), of Dodd & McClellan, of Champaign, for appellee.

JUSTICE LUND delivered the opinion of the court:

Defendant Eddie Pelmore, d/b/a Pelmore Construction Enterprises, appeals from a $112,527.88 judgment entered in favor of plaintiff Ann Beasley following a bench trial in the circuit court of Champaign County.

Defendant contracted to demolish a building owned by defendant Laborers' Local No. 703 (Union) next to and with a party wall of a building owned by plaintiff which housed a business known as the Old Fashion Tavern. In demolishing the portion of the party wall adjacent to the rear of plaintiff's building a collapse resulted, damaging the building. The trial court granted summary judgment on the issue of liability, based primarily upon *res ipsa loquitur*. Defendant contends this was error and also contends error in determining damages.

## RES IPSA LOQUITUR

Our supreme court concisely stated the *res ipsa loquitur* (*res ipsa*) doctrine in *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 448-49, 207 N.E.2d 305, 307. The act causing the injury must be shown to be under the control or management of the party charged with negligence and it must be shown that the occurrence would not ordinarily have happened if those in control had used reasonable care. If those elements are shown, then a presumption or inference of negligence is raised and the presumption or inference does not vanish when contrary evidence appears, but remains to be considered with all evidence in the case. Whether the doctrine applies in a given case is a question of law. (*Metz*, 32 Ill. 2d at 449, 207 N.E.2d at 307.) The *Metz* decision is consistent with textbook treatment of the doctrine. See 65A C.J.S. *Negligence* §§ 220.1, 220.2, 220.6, 220.9, at 506, 512, 537, 549 (1966).

■ Here, we have a defendant in sole control of demolition of the adjoining building, which included removal of the top portion of the wall adjoining plaintiff's building. Evidence here indicates a party-wall agreement. Plaintiff had the right to use the wall for support of her building. (See *Illinois State Bank v. Neece* (1976), 43 Ill. App. 3d

470, 357 N.E.2d 228.) As a general rule, neither adjoining owner of a party wall has a right to destroy or remove it. (69 C.J.S. *Party Walls* § 16, at 15 (1951).) The responsibility, then, was upon defendant to complete his demolition without damaging plaintiff's property.

The removal of the front portion was completed by handwork, and no damage occurred. A hydraulic hoe was used to push the back portion of the wall and, in doing so, a hole was knocked out, resulting in collapse of a portion of the wall and, according to plaintiff's evidence, creating serious structural damage to at least a portion of the wall supporting plaintiff's building.

While defendant argues there was no evidence of negligence and that other factors may have caused the damage, we disagree. This, as was *Metz*, is a classic *res ipsa* case. Here, the damage would not have occurred absent defendant's negligence, and summary judgment was proper.

## DAMAGES

Prior to the granting of plaintiff's motion for summary judgment, the case had gone to a jury trial. At the close of plaintiff's case, the judge declared a mistrial. The parties then agreed to submit the case to the trial court in a bench trial. That trial was held on March 1, 1993.

In her case in chief in the damages trial, plaintiff presented her own jury trial testimony and that of Karl Zech, David Wickersheimer and Gary Meneley.

David Wickersheimer's jury trial testimony was that he is a consulting structural engineer. He examined plaintiff's building at her former attorney's request. The building has two distinct structural systems, one in the front and one in the back (where the damage occurred). The north 20 feet (the rear of the building) adjacent to the west wall (the common wall) had completely collapsed. The section to the east had been weakened. Had the accident not occurred, the west wall could have served as a wall of plaintiff's building. The wall was noticeably out of plumb, meaning that it was no longer vertical and was unstable. He used a plumb bob to determine this. It was his opinion that the building could have been reconstructed and returned to use as a tavern.

If the west wall was to remain, he recommended reinforcing it to a height above the building's ceiling plane and tying it with anchors to the roof construction. The ceiling plane should also have been taken down and replaced in the tavern area because the ceiling sags.

Wickersheimer could see areas where some of the nails into the joists had pulled loose from the impact. There were clean sections of

wood visible from the displacement that had occurred in the ceiling plane and in the roof girders. Since everything else was dirty from age, it was clear the movement had been relatively recent. It would be impossible to assess how many of the nails had lost their mechanical bond.

The roof in the collapsed and weakened areas needed to be replaced. Wickersheimer recommended that the entire length of the west wall be replaced because of his inability to assess what sector of the wall was good and what sector was not. By its being out of plumb, the wall would have to be torn down and reconstructed to make it a vertical wall anyway. Part of his reasoning is that after the demolition, the wall would be an exterior wall instead of an interior wall, which would make it subject to wind loads it did not have to endure before and it would no longer be supported by the demolished building. Reconstructing it as a concrete block wall would have been just as sufficient as brick and more cost effective. Wickersheimer admitted he has no way of knowing whether the wall was out of plumb before the accident. The wall could possibly be reinforced by using pilasters, which would not require the wall to be torn down. He also admitted that using drywall screws or longer nails might stabilize any loose joints in the ceiling in the front part of the building and take care of the sag that way.

Gary Meneley's jury trial testimony was that he was part owner of a construction company in 1985. He inspected plaintiff's building and gave her an estimate of repairs. The total amount of his estimate was $89,921. This would have put the building into the condition plaintiff wanted it in to operate her business. He prepared two estimates. A second estimate (for $38,272) was prepared at the request of plaintiff's insurance company, and was for repair of damages caused by the falling brick, including structural and cosmetic damage and damage due to weather. Additional work other than that on the lower estimate would have to be done before the building could have reopened as a tavern. He had access to the reports of the structural engineer, and he attempted to comply with those recommendations in his estimates. Meneley admitted the higher estimate contained some items of general betterment to the property, as opposed to specific items for repair of damage done by the falling bricks. Meneley did not specify what items in the higher estimate were for improvement of the building.

Karl Zech's jury trial testimony focused on damage to plaintiff's personal property. He testified he is a friend of plaintiff and that he is an electrician with 40 years' experience. Plaintiff called him to her tavern on the day of the collapse. He observed damage to the

electrical wiring inside the rear of the building and that there were bricks and dust all over everything. He disconnected the power. The walk-in cooler where plaintiff kept her beer and perishables would not operate. The compressors for the coolers in the front of the tavern would not operate because they were full of dirt and debris. Dust is the worst thing for contacts and on electronic devices. There were stress cracks in the drywall in the front part of the building. The duct work for the air conditioning was torn down. The meter recorded the power drain, and plaintiff had a $1,400 electric bill while using nothing requiring electricity. He and plaintiff compiled an inventory of her damaged personal property within a week of the collapse. He made only a cursory examination of the items at that time. He later went to the place where plaintiff had stored her property and made another examination of the items using a multimeter and an ohmmeter.

Zech went through his list of items, testifying as to what could and could not be repaired. He admitted he was not qualified to testify as to the fair market value of any of the items as of the date of the damage. He also stated that he could not testify as to whether the repair cost of the items exceeded their value without taking the items apart and further testing them to find out what needed to be repaired, which he did not do. The trial court would not allow evidence of replacement cost, but allowed evidence of costs of inspection and cleaning. Zech was allowed to testify that repair costs of certain items exceeded their replacement cost.

At the jury and bench trials, plaintiff testified she did not rebuild the building because she did not have the money. Prior to the collapse, she had put new plate glass in the front of the building, recessed the entry way, added a new roof, had insulation blown in, and put in a new furnace and air conditioning, in addition to a new floor and toilet in the men's rest room.

She took several inventories at the request of defendant's insurance representatives. One was a spoilage inventory on items disposed of because of odor. Another inventory was for smashed items in the back room. Exhibit No. 4 from the jury trial was mainly for cleaning costs until the extent of damage could be determined. At that point, the items had not been electrically checked. Damaged items were also listed on exhibit Nos. 3, 5A, and 17 from the jury trial.

At the jury trial, plaintiff's counsel sought to qualify her as an expert witness on valuation of her damaged personal property. She testified that she first became involved in the tavern business in 1962 when she was a bartender for her uncle. In 1964 she began working for another tavern and became involved in ordering inventory; after

that she was manager of a bar. She did all ordering of merchandise and inventory and contracted repairs for equipment, and she bargained on prices and sold used equipment. She has done these same things in her own business. She has become familiar with the market price for various items in the tavern and has sold used equipment out of her bar, such as a jukebox, cooler, big draft box, and pool table. She prepared a list of each item that was in the bar on the day of the accident, including the age and expected remaining useful life of each.

With regard to the fair market value of each item, she determined what she believed would be sale price of each item prior to the injury. She took into account the amount of service life for each item that had been used and that which remained. For merchandise in constant use, she knew what she had paid and had receipts.

She admitted she had filed a proof of claim with her insurance company for $36,450 for damages to her building and $19,192.10 for damage to the contents. She did this because she could not get anything resolved with defendant's insurance representatives, and her attorney worked out a settlement with her insurance company because she needed the money at the time. The proof of loss was submitted at the insistence of the insurance company. It did not represent the true amount of the damage she suffered, but merely what the company had agreed to pay.

At the bench trial, plaintiff identified "Exhibit X," which was a compilation of exhibit Nos. 3, 4, 5A, and 17 from the jury trial. She had compiled this list in accordance with the trial court's instructions. Exhibit X contained a listing of all her damaged and destroyed personal property. On that list, she gave her estimate of the fair market value of the items destroyed and the cleaning and repair costs of those items not destroyed. In doing so, she utilized the information from Zech's testimony as to cost of cleaning and repair. She testified that she has no formal training in repairing heating and refrigeration devices. She did not inspect any items electrically damaged, and she has no knowledge of repair costs; she only knows the items would not work.

Plaintiff testified there are only a certain number of liquor licenses available in the City of Champaign (City). She maintained her license for two years after the collapse, believing her building would be repaired and she would be able to reopen her business.

At the direction of defendant's insurance representatives, she hired a security company to guard the premises for 30 days. After defendant's insurance company received Wickersheimer's report, she was told it would take longer than anticipated to restore the building

and that she should store her personal property, which she did. The items remained in storage for over two years, and this resulted in a very large bill which she could not pay. The storage company sued her for the amount of the bill, and she had to move the items. She could not afford to replace the items she had in storage because she had no income. She tried to sell them to other bar owners in town, but no one wanted them because of uncertainty that they would work or could be repaired. She planned to put them back in her building, but received a notice from the City that her building would be demolished and she would be charged for the cost. She then sold the building to Larry Peters in an "as is" condition, and he allowed her to store the items in the back of the building. After nine months, he asked her to move them. She considered auctioning them but, after exposure to the elements, they were worthless, and she found a man to haul them away at no charge to her.

Defendant presented his own testimony and the depositions of Eugene Daily and Larry Peters.

Eddie Pelmore testified on his own behalf. He stated that the debris fell only on the rear part of the building. A couple of wheelbarrows full fell, making a hole in the roof about four feet by eight feet. He and his crew attempted to clean out the debris from inside the back of the building. He cannot recall what items of personal property were in the back. The front part of the tavern was covered with dust, but was not damaged by the falling debris. He put up some canvas to cover the hole. He would have temporarily fixed the roof so it would have kept the weather out, but one of his workers told him plaintiff had said to get off her property.

Defendant tendered the evidence deposition of his expert witness, Eugene Daily. Daily testified that he is a licensed structural and professional engineer. In 1985, he had his own civil engineering firm. He inspected plaintiff's building in 1985 and 1986. The building had been built in two stages. The front part was constructed first between two other buildings. That part was essentially a roof structure supported by three rows of columns carrying the roof to the ground foundation, and the walls of the two adjacent buildings were merely the outside interior walls of the tavern building. A later addition to plaintiff's building to the north (back of the building) used a different framing system. It was a series of joists supported on the interior of the building by a block wall in one case and, in the other case, by a plank lagged to the then-existing walls of the adjacent buildings. The common wall of the Union building provided no structural support for the roof in the front part of the tavern.

All the buildings were late 19th century or early 20th century in

age. The west 12 feet of the back of the building had completely collapsed. The roof of the building, as a whole, was not in good shape for preservation. It had blistered and cracked from the weather. He inspected the flashing of the roof and found no movement. Inside the building he saw only normal and superficial cracks in the ceiling that would be consistent with normal building movement but had no relation to the demolition. There was no out-of-"plumbness" of the west wall noticeable to the naked eye. The exterior of the west wall was in poor condition, partially due to the way it had been constructed. The bricks were soft and mortar was loose. The wall would have to be tuck-pointed and weatherproofed, but that had nothing to do with the falling bricks. His opinion was that the only structural damage to plaintiff's building was about 250 square feet of her roof and the roof support on the northwest corner of the building. There was also some superficial damage which could be repaired through decoration and wall finish.

Daily also testified that removing the flooring of the Union building removed one of the primary structural elements stabilizing the wall. After the demolition, the wall needed lateral support to function as an outside wall of the tavern. Tying the roof on the front part into the wall could provide lateral support for it.

The discovery deposition of Larry Peters was admitted into evidence as an evidence deposition in defendant's case. Peters testified that he owns a furniture store in Champaign. He bought plaintiff's building from her in 1988 for $22,000. He had bought another commercial property in that area, and he used that as a guide on the price. There were no negotiations. He made an offer and plaintiff accepted it. He was aware of the demolition accident, but he did not go inside the building prior to agreeing to purchase it. It had not been repaired. He did not seek any estimates of repair costs before purchasing it. Part of the west wall was caved in at the back of the building. He hired a couple of different contractors to do the repair work. An engineering firm assisted him as to how to go about repairing the roof. A masonry firm repaired the wall by using new and old brick. Another man weatherproofed the wall with a silicone coating. In repairing the roof, new ceiling joists were put in where needed and laminated beams for strength, plus new plywood and roofing materials. Peters attempted to patch the roof, but ultimately had to reroof the whole building because the old one was in bad shape from age. He had to refinish certain areas of the interior walls because of the effects of cigarette smoke. The total cost of repair (including $2,000 which Peters (who had experience as a carpenter) assigned to his own labor) was just over $9,000. He used the building

for storage and then rented it to some people who are using it as an office and resale store. He has had no problems with the wall since the repairs. The work he personally did would probably have cost him $4,000 to $6,000 more if he had hired it done. He just went to the building and worked when he had time.

Peters further testified that he had to put in a new furnace and air conditioning because of the condition the building had been left in after the accident. Those items needed replacing in any event for safety reasons, as they were approaching the end of their useful life.

Plaintiff testified in rebuttal that there were more than two wheelbarrows of bricks that fell through the roof. Truckloads of debris were taken out of her building. Neither defendant nor his insurance representatives ever offered to do anything more than put canvas and plywood over the hole in the roof. She denied ever telling defendant or his workers to get off her property. It was defendant's insurance representatives who had put up the canvas and plywood, not defendant himself.

Admitted into evidence was a certified copy of a City ordinance revising chapter four of its code (alcoholic beverages). Plaintiff's counsel represented to the court that this evidence sought to counter Peters' testimony on the cost of repairs to the building by showing the requirements plaintiff would have had to meet in order to reopen her tavern business. Defendant did not object to the admission of this evidence.

On April 20, 1993, the trial court rendered a memorandum opinion. The court accepted Meneley's higher estimate of $89,921. The court stated the evidence showed this was the estimate that would restore plaintiff's building so it could once again operate as a tavern. The repairs necessitated bringing the building up to code. It had previously been "grandfathered" in. The court also accepted plaintiff's list of damaged items, except $956.65 for a 5.5-horsepower compressor and $4,341.94 for the security company, the latter expense having been paid by Pelmore's insurance company. The damages thus allowed were $44,606.88, bringing the total damages found for plaintiff to $134,527.88.

On June 7, 1993, after hearing defendant's post-trial motion, the court granted a reduction in the damages for the $22,000 received by plaintiff from Peters for sale of the building, bringing the revised damage award to $112,527.88.

A reviewing court will not disturb a trial court's findings as to damages unless its measure of damages was erroneous as a matter of law or the trial court ignored the evidence. (*Bockman Printing & Services, Inc. v. Baldwin-Gregg, Inc.* (1991), 213 Ill. App. 3d 516, 523, 572

N.E.2d 1094, 1100.) A plaintiff has the burden of proving damages to a reasonable degree of certainty. (*Williams v. Board of Education of Clinton Community Unit School District No. 15* (1977), 52 Ill. App. 3d 328, 333, 367 N.E.2d 549, 553.) The law does not require a plaintiff to prove the exact amount of his or her loss. Rather, it is sufficient that the evidence provide a basis for assessing damages with a fair degree of probability. *Gannon v. Freeman* (1982), 103 Ill. App. 3d 917, 919, 431 N.E.2d 1303, 1305.

■ The proper measure of damages for personal property that is completely destroyed is the reasonable value of the property immediately prior to its destruction. (*Gannon*, 103 Ill. App. 3d at 919, 431 N.E.2d at 1305.) The standard for assessing damages for injury to repairable personal property is the reasonable cost of repairs. The trial court is not required to calculate the amount of damages at the highest possible cost, but only at a reasonable cost. (*Northern Illinois Gas Co. v. Vincent DiVito Construction* (1991), 214 Ill. App. 3d 203, 215, 573 N.E.2d 243, 251.) Of course, the plaintiff must provide evidence as to the value of the property which was destroyed or injured. *Millburn Mutual Insurance Co. v. Glaze* (1980), 86 Ill. App. 3d 1055, 1061, 410 N.E.2d 295, 300.

The measure of damages for real property is the diminution in market value of the real estate, except when the damages are only partial and repairs are reasonably priced. In the latter case, the cost of repairs is the appropriate remedy. *Matich v. Gerdes* (1990), 193 Ill. App. 3d 859, 865, 550 N.E.2d 622, 625.

Defendant's first argument on the damages issue is that the trial court erred in choosing Meneley's higher estimate of $89,921 to repair plaintiff's building. Defendant contends this estimate involved a complete demolition and reconstruction of the building and that the higher estimate was admitted by Meneley to contain items of general betterment to the building. Defendant also emphasizes the amount Peters spent to fix the building was much less than even Meneley's lowest estimate.

Both estimates given by Meneley were admitted into evidence at the bench trial, but Meneley was not questioned on specific items contained in either estimate. Defendant does not specify, nor was there any testimony on, just what items in the higher estimate were alleged to be improper. Meneley testified that he gave the lower estimate at the request of plaintiff's insurance company, and he stated that other work would have to be done in addition to the work contemplated by the lower estimate in order for plaintiff to be able to use the building as a tavern. However, he did not indicate what additional work would be involved.

■ Recommendations of the two experts, Wickersheimer and Dailey, whose testimony was received at the bench trial, differed as to what would be required to restore the building. Since no testimony was elicited as to what parts of Meneley's higher estimate were improvements or what extra work would need to be added to the lower estimate for plaintiff to be able to reopen her tavern business, we do not find the court's decision to choose the higher estimate to be manifestly unreasonable. Plaintiff presented her estimate from a contractor whose competence was not questioned by defendant, and it was defendant's burden to impeach that estimate by showing it to be improper or unreasonable. We also note that although defendant claims the higher estimate was too costly, there was no proof at trial as to the value of plaintiff's building at the time of the collapse, thus making it more difficult for the trial court to know what repair costs would be reasonable or unreasonable. Defendant has not argued on appeal, nor did he argue in the trial court, that plaintiff failed to prove the value of her building prior to the injury, thus waiving any potential error in this failure.

Defendant also argues the court improperly relied upon evidence of what it would take to bring the building up to "code," pointing out that no testimony tied the "code" into what had to be done to plaintiff's building. He further notes the only "code" introduced into evidence was an ordinance amending the alcoholic beverages section of the "code," not the building code. While it is true that no one testified as to what had to be done to the building to comply with any "code" of the City, we do not find that fact to be dispositive of the issue. A trial court's judgment may be sustained on any basis warranted by the record, regardless of the basis articulated by that court. *O'Loughlin v. Servicemaster Co. Ltd. Partnership* (1991), 216 Ill. App. 3d 27, 39, 576 N.E.2d 196, 205.

Defendant also argues that the trial court erred in its award of damages to plaintiff for her personal property. He concedes the following are proper items for which plaintiff should have recovery:

| | |
|---|---|
| Security services (reimbursed by Pelmore's insurance company) | $4,341.94 |
| Wickersheimer Engineering | 520.00 |
| A-1 Alarm | 220.90 |
| Scottie's Refrigeration | 1,288.45 |
| Champaign-Urbana News Gazette | 166.05 |
| Illinois Power | 1,378.41 |
| | $7,915.75 |

| | |
|---|---|
| Liquor | $ 698.12 |
| Contents (as indicated on plaintiff's exhibit No. 4) | 6,895.53 |
| Damage to piano | 300.00 |
| | $7,893.65 |
| Clean & inspect: | |
| two 3.5-horsepower compressors | $ 684.00 |
| four cleaning machines | 150.00 |
| four speakers | 185.00 |
| ceiling-mounted air cleaner | 845.00 |
| Kenmore microwave oven | 545.00 |
| roof air conditioner | 285.00 |
| six-foot cooler | 420.00 |
| 10-foot cooler | 420.00 |
| shuffleboard game | 620.00 |
| furnace | 95.00 |
| water heater | 80.30 |
| Clean two bathroom fans | 30.00 |
| Replace cutting grid on ice machine | 431.00 |
| Repair walk-in cooler | 342.00 |
| | $5,132.30 |

At the bench trial, defendant made objections to certain specific items listed on plaintiff's exhibit X. The trial court ruled on those objections, and the exhibit was admitted into evidence subject to those rulings. On appeal, defendant would have us deny recovery to plaintiff for all damages to personal property and miscellaneous expenses except those which he concedes in his initial brief that she is entitled to and which are detailed above. However, defendant has waived any argument that recovery should be denied for those items contained in exhibit X to which he did not make an objection at trial. (See *E&E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 38, 481 N.E.2d 664, 666; *Moore v. Roberts* (1991), 217 Ill. App. 3d 446, 450, 577 N.E.2d 538, 541.) Therefore, we will consider only the items to which defendant raised specific objections at trial.

■ Defendant disputes the reasonableness of the $9,683.68 paid for storage of plaintiff's personal property, arguing plaintiff had a duty to mitigate her damages. Essentially his argument is that plaintiff should have realized sooner than she did that she would be unable to reopen her business and immediately terminated her storage costs. However, we are not inclined to judge plaintiff so harshly. She testified that she did not have sufficient financial resources to repair her building and to repair or replace her damaged and destroyed personal property. She further testified she relied on assur-

ances from defendant's insurance representatives that the damage would be remedied and she could then reopen her business. In fact, it was defendant's insurance representatives who told her to store her personal property because it would take longer than initially anticipated to restore the building. She testified this was done after those representatives were given a copy of Wickersheimer's recommendations on repairing damage to the building. Although two years elapsed before plaintiff terminated the storage costs, it still might have been possible for her to reopen her business, had this matter been resolved more swiftly.

The same reasoning applies to defendant's complaint that plaintiff should not have incurred the cost of her liquor license for two years after the collapse. Plaintiff testified there were a limited number of licenses granted by the City. It appears from the sequence of events that she relinquished her license about the same time she sold her building to Peters under threat from the City to demolish it at her expense. Under these circumstances, maintaining the license for two years was not unreasonable.

■ Defendant objects to the allowed damages of $1,306.66 for plaintiff's Seaburg jukebox. He argues this jukebox was valued at $870 on exhibit No. 4, thus creating a conflict in the evidence. It appears there is a conflict, but the testimony does not explain the nature of the conflict. Plaintiff did testify that exhibit Nos. 3 and 4 were prepared early on, before the items had been electrically checked, and that much of the stated damage at that time was for inspection and cleaning. However, there is a notation at the top of exhibit No. 3 stating the Seaburg jukebox was smashed, leading to the conclusion that the $870 on exhibit No. 4 was the fair market value of the jukebox. Under these circumstances, it was error for the court to accept the higher valuation. Thus, the judgment appealed should be reduced by $436.66 ($1,306.66 minus $870).

Defendant also complains of $1,199.25 awarded to plaintiff for two electric cash registers as listed on her exhibit X. On plaintiff's exhibit No. 4, she listed damages for these items at $75 each for cleaning. Plaintiff had the burden of proof on the issues of damage, cost of repair, and fair market value. As defendant points out, there was no additional evidence these items had been damaged beyond the need for inspection and cleaning. Thus, the trial court should not have awarded more than $150 for these two items. The judgment must therefore be reduced by $1,049.25 ($1,199.25 minus $150).

Defendant contends the award of $2,706.66 for a Rockolla jukebox was in error, because plaintiff claimed damages of only $145 on exhibit No. 3 for cleaning the circuits, interior, records and coin mech-

anism, and rewiring. Defendant's objection to this was overruled. Testimony indicated this was a jukebox located in the front of the building. Thus, it did not sustain any direct damage from the collapsing roof. Plaintiff testified she believed the damage was electrical and from insulation getting into it. She did not know the extent of the damage or the repair costs. This was not one of the items inspected and testified to by Karl Zech. Without evidence as to damage sustained and costs of repair, the court erred in awarding plaintiff fair market value of this item. Damages should have been $145. The judgment must therefore be reduced by $2,561.66 ($2,706.66 minus $145).

Another discrepancy pointed out by defendant is damage to a cigarette machine. Plaintiff's exhibit No. 3 claims $60 to clean and inspect it, while exhibit X claimed damages of $1,654.80. The trial court overruled defendant's objection to the amount claimed in exhibit X. Plaintiff testified the machine was full of insulation. She did not know the amount of the repair costs, and Zech did not inspect this item. As with the other items just discussed, plaintiff did not meet her burden of establishing the extent of damage and cost of repair. The damages award on this item should have been limited to $60. The judgment must therefore be reduced by $1,594.80 ($1,654.80 minus $60).

For the reasons stated, the trial court's order granting summary judgment to plaintiff on liability is affirmed. The order on damages is modified to grant plaintiff damages totaling $106,885.51 ($112,527.88 minus a total of $5,642.37) and is affirmed as modified.

Affirmed as modified.

McCULLOUGH, P.J., and COOK, J., concur.