# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2015 Term

No. 14-0058

FILED

**February 6, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**CITYNET, LLC,**
**Defendant Below, Petitioner**

**V.**

**RAY TONEY,**
**Plaintiff Below, Respondent**

---

Appeal from the Circuit Court of Kanawha County
Honorable James C. Stucky, Judge
Civil Action No. 12-C-527
AFFIRMED, IN PART, AND, REVERSED, IN PART

---

Submitted: January 14, 2015
Filed: February 6, 2015

Ancil G. Ramey                           J. Michael Ranson
Bryan C. Cokeley                         Cynthia M. Ranson
Russell D. Jessee                        Ranson Law Offices
Steptoe & Johnson PLLC                   Charleston, West Virginia
Charleston, West Virginia                Attorneys for the Respondent
Attorneys for the Petitioner

JUSTICE DAVIS delivered the Opinion of the Court.
JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous.  The question as to whether a contract is ambiguous is a question of law to be determined by the court."  Syllabus point 1, *Berkeley County Public Service District v. Vitro Corporation of America*, 152 W. Va. 252, 162 S.E.2d 189 (1968).

2. "Where the terms of a contract are clear and unambiguous, they must be applied and not construed."  Syllabus point 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969).

3. """It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."  Syllabus Point 3, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).'  Syllabus point 1, *Hatfield v. Health Management Associates of West Virginia*, 223 W. Va. 259, 672 S.E.2d 395 (2008)."  Syllabus point, 5, *Dan's Carworld, LLC v. Serian*, 223 W. Va. 478, 677 S.E.2d 914 (2009).

4. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

5. "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959).

6. "'"The West Virginia Wage Payment and Collection Act is remedial legislation designed to protect working people and assist them in the collection of compensation wrongly withheld." Syllabus, *Mullins v. Venable*, 171 W. Va. 92, 297 S.E.2d 866 (1982).' [Syllabus point] 3, *Jones v. Tri-County Growers, Inc.*, 179 W. Va. 218, 366 S.E.2d 726 (1988)." Syllabus point 7, *Grim v. Eastern Electric, LLC*, No. 13-1133, ___ W. Va. ___, ___ S.E.2d ___, 2014 WL 5800677 (Nov. 3, 2014).

7. "'"It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W. Va. 445, 300 S.E.2d 86 (1982).' Syllabus point 1, *E.H. v. Matin*,

ii

201 W. Va. 463, 498 S.E.2d 35 (1997)." Syllabus point 7, *J.A. Street & Associates, Inc. v.*

*Thundering Herd Development, LLC*, 228 W. Va. 695, 724 S.E.2d 299 (2011).

**Davis, Justice:**

Petitioner Citynet, LLC ("Citynet"), herein appeals two orders issued by the Circuit Court of Kanawha County in an action filed by a former Citynet employee, Ray Toney ("Mr. Toney"), respondent herein, seeking to redeem the vested balance of his Employee Incentive Plan account. One order granted partial summary judgment to Mr. Toney, and the other denied Citynet's subsequent motion under Rules 59(e) and 60(b) of the West Virginia Rules of Civil Procedure. Citynet claims that the circuit court erred by failing to adopt Citynet's interpretation of its Employee Incentive Plan; by applying the West Virginia Wage Payment and Collection Act; and by sustaining its award of $87,000.48 to Mr. Toney without offsetting that amount by $17,400.10 Mr. Toney already had received from his Employee Incentive Plan account. We have considered the parties' briefs and oral arguments and reviewed the relevant law. We conclude that the circuit court did not err in granting partial summary judgment to Mr. Toney, or in applying the West Virginia Wage Payment and Collection Act. We, therefore, affirm the circuit court's orders on these grounds. However, we find that the circuit court did err in setting the date from which prejudgment interest would accrue and in failing to offset its award by $17,400.10 that Mr. Toney previously had received from his Employee Incentive Plan account. Therefore, these portions of the circuit court's orders are reversed.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

On January 1, 2008, Citynet established an Employee Incentive Plan ("Plan").

The stated purpose of the Plan is "to create incentives which are designed to motivate

Participants . . . to put forth maximum effort toward the success and growth of the Company

and to enable the Company to attract and retain experienced individuals who by their

position, ability and diligence are able to make important contributions to the Company's

success." By letter dated January 22, 2008, Mr. Toney was advised that he was 100% vested

in the Plan because he had been employed by Citynet for more than five years. His vested

balance in the Plan as of January 1, 2008, was $ 42,933.73. The letter provided details of

how the Plan worked[1] and expressly stated that "[w]hen an employee leaves Citynet, the

---

[1]The letter stated, in part, that

Employee Performance Units – granted annually in January of each year and are determined by the formula of "employee's total gross compensation from the previous year / 1,000 X Grade Multiplier." The grade multiplier is based on your level of responsibility in the company (Executive, Management/Engineer, Supervisor/Technician, and Staff). In addition, at the owners' discretion, bonus performance units may be awarded annually.

. . . .

Annual Valuations and Performance Unit Allocations: As soon as administratively possible during the first quarter of each year, new performance units will be awarded to every employee. The

(continued...)

employee is then entitled to 'cash out' his or her entire <u>vested</u> balance subject to certain provisions contained in the plan document with respect to termination for cause." Mr. Toney received a Plan update by letter dated August 4, 2010, wherein he was advised that his vested balance as of January 1, 2010, was $87,000.48.[2]

On October 12, 2011, Mr. Toney voluntarily terminated his employment with Citynet and requested to redeem his $87,000.48 vested balance in the Plan. Citynet refused Mr. Toney's request to redeem his vested balance. Citynet advised Mr. Toney that he could redeem no more than twenty percent of his vested balance annually, and that his request could be made only during a specific four-month period. In reaching this conclusion, Citynet

---

[1](...continued)
new performance units awarded will have their own value that is unique and different from other years. The value of each unit in successive years will be based on the increase in equity value of the company, if any, from the year before.

Thus, the monetary value of each Citynet employee's Employee Incentive Account was to be calculated annually based upon the number of performance units granted to a particular employee and the value assigned to those performance units.

[2]The August 4, 2010, letter also clarified that the Employee Incentive Plan is not a retirement plan:

[T]he Citynet Employee Incentive Plan is a non-qualified plan under the Internal Revenue Code. This means that the plan does not qualify to be a retirement plan like the Citynet 401K Plan. As such, payouts from the Employee Incentive Plan are considered to be taxable income to the employee when received and direct rollovers to other retirement plans are <u>not</u> allowed.

3

applied section 5.7(b) of the Plan, which states:

> (b)    <u>Annual Voluntary Redemptions</u>.  The Company has established an annual Voluntary Redemption Period during each calendar year, defined as the period of May 1st through August 31st, in which the Participants may redeem up to a maximum of 20% of their vested Performance Units during each calendar year.  Voluntary redemption requests that exceed the 20% maximum or are received by the Company outside of the Voluntary Redemption Period shall be considered null and void. . . .

Thereafter, on March 23, 2012, Mr. Toney filed a complaint in the Circuit Court of Kanawha County seeking to recover his vested balance in the Plan of $87,000.48. In his complaint, Mr. Toney asserted three counts: (1) violation of the Plan; (2) willful violation of the Plan; and (3) a Wage Payment and Collection Act violation. Mr. Toney claimed, *inter alia*, that he was entitled to full payment of his vested benefits pursuant to section 5.7(a) of the Plan, which states:

> (a)    <u>Termination of Employment</u>.  In the event the participant's employment is terminated without Cause, the Participant shall be eligible to redeem the vested portion of their [sic] Performance Units as of the effective date of the Participant's termination. . . .

Citynet responded to Mr. Toney's complaint by filing a motion to dismiss. Mr. Toney then filed a motion for partial summary judgment seeking judgment in his favor as to counts one and three of his complaint. Citynet filed its response to Mr. Toney's motion for

4

partial summary judgment and asserted a cross-motion for summary judgment claiming that, under Section 5.7(b) of the Plan, Citynet was not required to pay Mr. Toney any of his vested benefits insofar as his request had been improperly made and was, therefore, null and void.

By order entered September 18, 2012, the circuit court granted partial summary judgment to Mr. Toney and denied Citynet's motion to dismiss and its cross-motion for summary judgment. Agreeing with Mr. Toney, the circuit court concluded that, pursuant to Section 5.7(a) of the Plan, Mr. Toney was entitled to payment of his entire vested balance in the Plan. In addition, the circuit court concluded that Citynet's failure to timely pay Mr. Toney his vested balance violated the West Virginia Wage Payment and Collection Act (hereinafter "WPCA"). Based upon the WPCA violation, the circuit court ruled that Citynet was liable to Mr. Toney for liquidated damages, the costs of the action, and reasonable attorney's fees. Accordingly, the circuit court awarded Mr. Toney his vested Plan balance of $87,000.48, and liquidated damages in the amount of $261,001.44, and further ordered Citynet to pay Mr. Toney's reasonable attorney's fees and costs.

Citynet then filed its "MOTION FOR RECONSIDERATION AND MOTION UNDER RULES 59(E) AND 60(B) OF THE WEST VIRGINIA RULES OF CIVIL PROCEDURE." In this motion, Citynet argued that it had not breached the Plan, that the WPCA did not apply, and that Mr. Toney had misrepresented his vested balance in the Plan.

5

With regard to Mr. Toney's vested balance, Citynet asserted that Mr. Toney had properly requested and was paid $17,400.00 of his vested balance. Therefore, the true amount of his vested balance in the Plan was $69,600.38. By order entered November 20, 2012, the circuit court denied Citynet's motion. Citynet appealed the circuit court's September 18, 2012, order granting partial summary judgment in favor of Mr. Toney and the circuit court's November 20, 2012, order denying Citynet's motions under Rules 59(e) and 60(b). This Court dismissed the appeal as interlocutory by Order entered April 18, 2013. Mr. Toney then filed a motion to voluntarily dismiss the one remaining unresolved count of his complaint, which alleged willful violation of the Plan by Citynet. By order entered December 30, 2013, the circuit court granted Mr. Toney's motion to dismiss. Entry of this order rendered the circuit court's earlier orders of September 18, 2012, and November 20, 2012, final and appealable. Thus, Citynet herein appeals the circuit court's orders of September 18, 2012, and November 20, 2012.

## II.

## STANDARD OF REVIEW

Citynet herein appeals the circuit court's order granting summary judgment in favor of Mr. Toney. Therefore, our review is *de novo*. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Because our review is *de novo*, we are mindful that "[a] motion for summary

judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

Citynet additionally appeals the circuit court's order denying its motion for relief, under Rule 59(e) of the West Virginia Rules of Civil Procedure, from the circuit court's partial summary judgment order. This Court previously has held that "[t]he standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. pt. 1, *Wickland v. American Travelers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998). Thus, we review *de novo* the circuit court's ruling on this motion. *See* Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755.

Having reviewed the proper standards for our review of the instant matter, we proceed to our discussion.

## III.

## DISCUSSION

Citynet raises three errors. First, Citynet argues that the circuit court erred by ruling that the Plan required Citynet to pay Mr. Toney's vested Plan balance. Citynet next argues that the circuit court erred by applying the WPCA. Finally, Citynet argues that the circuit court erred by failing to offset its award of Mr. Toney's vested Plan balance by an amount he previously had withdrawn from the account. We will address each of these errors in turn.

### A. *Payment of Mr. Toney's Vested Plan Balance*

The circuit court interpreted the language of the Plan as requiring Citynet to pay Mr. Toney the full amount of his vested balance in the Plan upon his voluntary termination of his employment with Citynet. Citynet essentially challenges the circuit court's conclusion on three grounds: (1) the circuit court erred by construing the Plan as if it were a contract; (2) the circuit court erred by interpreting the language of the Plan as requiring Citynet to pay Mr. Toney the full amount of his vested balance in the Plan upon his voluntary termination of his employment with Citynet; and, (3) the circuit court erred by interpreting the Plan without first allowing Citynet to conduct discovery. We separately will address each of these issues.

8

**1. Whether the circuit court had the authority to construe the Plan as a contract.** Citynet argues that the circuit court should not have substituted its judgment for the judgment of Citynet, which has complete authority to interpret its own Plan. According to Citynet, the Plan is not a contract but, instead, should be treated as a discretionary bonus over which Citynet has sole discretion. In support of its contention that the Plan is not a contract, Citynet asserts that the Plan was not negotiated with Mr. Toney. According to Citynet, Mr. Toney was entitled to a bonus only by "conclusively . . . accept[ing] and consent[ing] to all the terms of [the Plan] and to all actions and decisions of the Company and/or Board."[3] Citynet further argues that it was completely free to set the terms of the Plan and had exclusive authority to interpret the Plan.[4]

---

[3]The language quoted above appears in paragraph 6.14 of the Plan, which states in relevant part:

> 6.14    Consent to Plan Terms. By electing to participate in this Plan, a Participant shall be deemed conclusively to accept and consent to all the terms of this Plan and to all actions and decisions of the Company and/or Board. . . .

[4]Citynet notes that paragraphs 3.2 and 3.3 of the Plan provide as follows:

> 3.2    Board to Make Rules and Interpret Plan. The Board in its sole discretion shall have the authority, subject to the provisions of the Plan, to make all such determinations relating to the Plan as it may deem necessary or advisable for the administration of the Plan. The Board's interpretation of the Plan or any Awards and all decisions and determinations by the Board with respect to the Plan shall be final, binding, and conclusive on all parties.

(continued...)

9

Mr. Toney responds that the Plan is certainly a contract, and the circuit court correctly interpreted its language. Mr. Toney reasons that incentive plans are unilateral contracts that define the obligations and promises contained therein. We agree.

> This Court has long recognized and enforced unilateral contracts:
>
> > The concept of unilateral contract, where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise, has . . . been recognized: "That an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well established." *First National Bank* [*of Gallipolis*] *v. Marietta Manufacturing Co.*, 151 W. Va. 636, 641-42, 153 S.E.2d 172, 176 (1967).
>
> *Cook v. Heck's Inc.*, 176 W. Va. 368, 373, 342 S.E.2d 453, 458-59 (1986). It has been further explained that,
>
> > [i]n order for an agreement to be enforceable under contract law, the parties must manifest their objective intent to be bound. *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 641 A.2d 75, 79 (R.I. 1994) (applying R.I. law). Such intent is manifested through one party's offer and the other party's acceptance of the offer. *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989). When the offeror seeks acceptance though an act of performance on the part of the offeree, the offeror proposes a unilateral contract. *Flanders + Medeiros, Inc. v. Bogosian*, 868

---

[4](...continued)

3.3 <u>Appointment of Administrator(s)</u>. The Board may appoint an Administrator of the Plan to administer, construe, and interpret the Plan. The construction and interpretation by the Administrator of any provision of this Plan shall be final and conclusive.

10

F. Supp. 412 (D.R.I. 1994). A unilateral contract consists of a promise made by one party in exchange for the performance of another party, and the promisor becomes bound in contract when the promisee performs the bargained for act. *B & D Appraisals v. Gaudette Machinery Movers, Inc*., 733 F. Supp. 505, 508 (D.R.I. 1990).

*National Educ. Ass'n-Rhode Island by Scigulinsky v. Retirement Bd. of Rhode Island Employees' Ret. Sys*., 890 F. Supp. 1143, 1157 (D.R.I. 1995). *Accord Verizon West Virginia, Inc. v. West Virginia Bureau of Emp't Programs, Workers' Comp. Div*., 214 W. Va. 95, 129, 586 S.E.2d 170, 204 (2003) (Davis, J., dissenting).


This Court's opinion in *Cook v. Heck's* addressed the question of whether an employee handbook could constitute a unilateral contract creating job security. Thus, *Cook* is not directly on point with the instant matter. Nevertheless, the *Cook* holding is instructive insofar as it stands for the principle that an employer's written promise to its employees constitutes an offer for a unilateral contract that can be accepted by an employee continuing to work while under no obligation to do so:

> A promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and *an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable*.

Syl. pt. 5, *Cook*, 176 W. Va. 368, 342 S.E.2d 453 (emphasis added). In *Cook*, this Court elaborated on the concept of "consideration," and explained that

11

> [c]onsideration is . . . an essential element of a contract. *First National Bank* [*of Gallipolis*] *v. Marietta Manufacturing Co.*, *supra*, 151 W. Va. at 642, 153 S.E.2d at 177; *North American Royal Coal Co. v. Mountaineer Developers, Inc.*, 161 W. Va. 37, 39, 239 S.E.2d 673, 675 (1977).

>> Consideration has been defined as "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another." 17 Am. Jur. 2d, Contracts, Section 85. A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract. 17 Am. Jur. 2d, Contracts, Section 96.

> *First National Bank* [*of Gallipolis*] *v. Marietta Manufacturing Co.*, *supra*, 151 W. Va. at 642, 153 S.E.2d at 177.

*Cook*, 176 W. Va. at 373, 342 S.E.2d at 458-59.

Applying the *Cook* principles to the plan at issue in this case, Citynet's Plan offers to certain eligible employees the opportunity to participate in the Plan, *i.e.,* to be awarded Performance Units that would be assigned a monetary value.[5] To become eligible, an employee "must first complete one (1) year of full time employment with the Company [Citynet]." In addition, an eligible employee can redeem only awards that are vested. Vesting requires additional years of service by an employee. Thus, the Plan constitutes an offer for a unilateral contract to provide vested Performance Units with a monetary value to employees who remain employed by Citynet for a specific period of time. An employee who

---

[5]See *supra* note 1 for an explanation of the valuation of Performance Units.

12

remains so employed by Citynet while under no obligation to do so has accepted Citynet's offer and has provided sufficient consideration to make Citynet's promise binding and enforceable.

Stated another way, Citynet benefitted by attracting and retaining employees who desired to participate in the Plan, which is Citynet's expressed purpose for establishing the Plan. Indeed, the opening paragraph of the Plan states its purpose "to create incentives which are designed to motivate Participants . . . to put forth maximum effort toward the success and growth of the Company and *to enable the Company to attract and retain experienced individuals* who by their position, ability and diligence are able to make important contributions to the company's success. . . ." (Emphasis added). Likewise, Citynet employees who remain employed with the company long enough to participate in the Plan and become vested in the benefits offered, when they are under no obligation to do so, have provided sufficient consideration for the formation of a unilateral contract.

As one treatise has explained:

> The . . . unilateral contract analysis is applicable to the employer's promise to pay a bonus . . . to an employee in case the latter continues to serve for a stated period. It is now recognized that these are not pure gratuities but compensation for services rendered. The employer's promise is not enforceable when made, but the employee can accept the offer by continuing to serve as requested, even though the employee makes no promise. There is no mutuality of obligation, but

there is consideration in the form of service rendered. The employee's one consideration, rendition of services, supports all of the employer's promises, to pay . . . the bonus. Indeed, although the bonus is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract.

2 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 6.2, at 214 (rev. ed.1995) (footnotes omitted). Other courts have similarly found bonus or incentive plans to be unilateral contracts. *See Talent Tree, Inc. v. Madlock*, No. 4:07-CV-03735, 2008 WL 4104163, at *7 (S.D. Tex. Sept. 2, 2008) (unreported decision) (finding an incentive plan to be "an enforceable unilateral contract under Texas law"); *Holland v. Earl G. Graves Pub. Co.,* 46 F. Supp. 2d 681, 686 (E.D. Mich.), *on reconsideration*, 33 F. Supp. 2d 581 (E.D. Mich. 1998) (treating compensation package including a "fiscal year end volume incentive award" as unilateral contract and commenting that "Michigan courts have applied the theory of 'unilateral contracts' in a number of cases involving job benefits"); *Morse v. J. Ray McDermott & Co.*, 344 So. 2d 1353, 1357 (La. 1976) ("A majority of American jurisdictions . . . reject the contention that . . . profit-sharing benefits are merely gratuities payable at the will of the employer. They instead characterize an employer-financed . . . profit-sharing plan as a contractual inducement by the employer for the employee to remain in the employer's service, the benefits from which are in the nature of delayed compensation for the employee's services on behalf of the employer."); *Walker v. American Optical Corp*., 265 Or. 327, 330, 509 P.2d 439, 441 (1973) (commenting that

14

"the bonus plan offered by the employer normally becomes binding as a unilateral contract when the employee begins performance of the terms of the proposed plan, in the sense that the plan cannot then be revoked by the employer"); *Garner v. Girard Trust Bank*, 442 Pa. 166, 169, 275 A.2d 359, 361 (1971) (observing that "[t]he law is clear with regard to profit-sharing . . . plans. Even when the employee does not contribute to the plan, when he renders service to an employer who has such a plan in effect, he has a contractual right to enforce the plan according to its terms").

Thus, for the reasons stated above, we conclude that the circuit court made no error in concluding that the Plan is a unilateral contract and by interpreting the same for purposes of summary judgment in the absence of a factual dispute. *See* Syl. pt. 1, in part, *Orteza v. Monongalia Cnty. Gen. Hosp.*, 173 W. Va. 461, 318 S.E.2d 40 (1984) ("It is the province of the Court . . . to interpret a written contract." (internal quotations and citation omitted)); Syl. pt. 1, in part, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937) (same). *See also* Syl. pt. 1, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W. Va. 252, 162 S.E.2d 189 (1968) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.").

**2. Mr. Toney's entitlement to benefits under the Plan.** Citynet also argues that the circuit court erred in applying section 5.7(a) of the Plan. Citynet instead reasons that,

under section 5.7(b) of the Plan, Mr. Toney was permitted to request only twenty percent of his vested balance in the Plan and such request had to be made during the "Voluntary Redemption Period" between May 1st and August 31st.[6]  Because Mr. Toney's request was not made during this time frame and exceeded twenty percent of his vested balance, Citynet claims his request was null and void.  Mr. Toney responds that, under section 5.7(a) of the Plan, he was entitled to redeem his entire vested balance upon his voluntary termination of his employment.

This issue is resolved by examining the contract language.  Prior to doing so, we note that "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous.  The question as to whether a contract is ambiguous is a question of law to be determined by the court."  Syl. pt. 1, *Berkeley County Public Service District v. Vitro Corp. of America*, 152 W. Va. 252, 162 S.E.2d 189 (1968).  *Accord* Syl. pt. 3, *Energy Dev. Corp. v. Moss*, 214 W. Va. 577, 591 S.E.2d 135 (2003).  Moreover, "[w]here the terms

---

[6]Section 5.7(b) of the Plan states in relevant part,

(b)    Annual Voluntary Redemptions.  The Company has established an annual Voluntary Redemption period during each calendar year, defined as the period of May 1st through August 31st, in which the Participants may redeem up to a maximum of 20% of their vested Performance Units during each calendar year.  Voluntary redemption requests that exceed the 20% maximum or are received by the company outside of the Voluntary Redemption period shall be considered null and void. . . .

16

of a contract are clear and unambiguous, they must be applied and not construed." Syl. pt. 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969). In other words,

> "'[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' Syllabus Point 3, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962)." Syllabus point 1, *Hatfield v. Health Management Associates of West Virginia*, 223 W. Va. 259, 672 S.E.2d 395 (2008).

Syl. pt. 5, *Dan's Carworld, LLC v. Serian*, 223 W. Va. 478, 677 S.E.2d 914 (2009).

The circuit court concluded that Mr. Toney was entitled to payment of his entire vested balance pursuant to section 5.7(a) of the Plan, which states:

> (a) <u>Termination of Employment</u>. In the event the participant's employment is terminated without cause, the Participant shall be eligible to redeem the vested portion of their [sic] performance units as of the effective date of the Participant's termination. . . .

The foregoing language plainly entitles a Plan participant to redeem the vested portion of his or her performance units, or vested balance, in the event the participant's employment is terminated without cause. It is undisputed that Mr. Toney was vested in 100% of his performance units. Therefore, he was eligible to redeem the same under section 5.7(a) so long as his employment was terminated "without cause."

17

Citynet urges the conclusion that the language "terminated without cause" means terminated *by Citynet* without cause. Thus, Citynet contends, because Mr. Toney voluntarily terminated his own employment and was not terminated *by Citynet*, he was not eligible to redeem his performance units under section 5.7(a). Not only is this argument contrary to the plain language of section 5.7(a), which requires only that employment be "terminated without cause," but it also is unsupported by other plainly worded provisions of the Plan contract.

Termination events are expressly set out in section 5.6 of the Plan. Section 5.6 specifies four separate termination events and describes how a participant's performance units will be handled under each type of termination event.[7] Notably, subsection 5.6(b)

_____

[7]The four termination events set out in section 5.6 of the Plan are: (a) Termination of Employment for Cause; (b) Voluntary Termination of Employment by Participant; (c) Termination of Employment without Cause; and (d) Termination of Employment due to Retirement. Subsections (a) and (d) plainly to not apply to Mr. Toney, because he was not terminated for cause, and he did not retire. Subsection (c) provides, in part,

> (c)    Termination of Employment without Cause. In the event the Participant's employment with the company is terminated under any one of the following conditions: (i) the Company terminates the Participant's employment without Cause, or (ii) the Company terminates the Participant's employment due to the death of the participant, or (iii) the Company terminates the Participant's employment due to the Disability of the Participant, then all Performance Units granted to the Participant which have vested prior to the effective date of such termination shall be available for redemption. . . .

(continued...)

18

addresses voluntary termination of employment by a participant and, consistent with 5.7(a),

provides that vested performance units shall be available for redemption by a participant, like

Mr. Toney, who voluntarily terminates his own employment:

> 5.6 Termination Events. In the event a Participant's employment with the Company is terminated the Participant's Performance units will be handled as follows:
>
> . . . .
>
> (b) Voluntary Termination of Employment by Participant. In the event that a Participant voluntarily terminates employment with the Company after the 18 month anniversary of the Effective Date, all of the outstanding Performance Units granted to the Participant which have not vested as of the effective date of such termination shall be cancelled and forfeited without compensation to the Participant. *All Performance Units granted to the Participant which have vested prior to the effective date of such termination shall be available for redemption. . . .*

(Emphasis added).


Language found in section 5.12 of the Plan further supports the circuit court's

conclusion that, upon voluntarily terminating his own employment, Mr. Toney was entitled

to redeem his vested performance units. Section 5.12 of the Plan provides an "example of

how the Plan works." In the example,

> John, a Participant of the Plan, voluntarily terminated his employment with the Company on June 1, 2012. John had a total of 1,000 Performance Units granted to him by the

---

[7](...continued)
None of the conditions set out in subsection (c) apply to Mr. Toney.

Company as of the effective date of his termination. John has been employed by the Company for 5 years and has not redeemed any of his Performance Units.

> (a) Units available for redemption.
> John's Performance Units are vested at 100% since he has over 4 years of continuous employment with the Company since becoming a Participant. Therefore, all 1,000 of John's Performance Units are available for redemption.

After demonstrating how the value of "John's" performance units would be established, the example explains, "[g]iven that John had 1,000 vested Performance Units, the value of his redemption is equal to $96.00 x 1,000 = $96,000. *John would be due a total amount of $96,000 (less applicable withholding) from the Company* payable under the Payout provisions of the Plan." (Emphasis added).

Under the plain language of the Plan, including the example provided therein, it is clear that, upon Mr. Toney's voluntary termination of his employment, he was entitled to redeem the entirety of his vested performance units. Because Mr. Toney was clearly entitled to redeem his vested performance units under section 5.7(a) of the Plan, Citynet's argument that Mr. Toney's request had to comply with section 5.7(b) is simply unavailing. Our conclusion finds further support in a letter dated January 22, 2008, from Citynet President and CEO Jim Martin to Mr. Toney. The letter announced the Plan and included a "summary of the important details of how the plan works." Included in the letter is the statement that "[w]hen an employee leaves Citynet, the employee is then entitled to 'cash

20

out' his or her entire *vested* balance subject to certain provisions contained in the plan document with respect to termination for cause."[8]  Accordingly, we find no error in the circuit court's conclusion that Mr. Toney was entitled to redeem the entire vested balance of his performance units, or with the court's order granting him partial summary judgment based upon this conclusion.

**3.  Lack of discovery.**  Citynet additionally argues that the circuit court

---

[8]We do not use this letter to interpret the language of the Plan, which we have found to be clear and unambiguous.

> When a written contract is clear and unambiguous its meaning and legal effect must be determined solely from its contents and it will be given full force and effect according to its plain terms and provisions.  Extrinsic evidence of the parties to such contract, or of other persons, as to its meaning and effect will not be considered.

Syl. pt. 3, *Kanawha Banking & Trust Co. v. Gilbert*, 131 W. Va. 88, 46 S.E.2d 225 (1947). Instead, we quote from the letter merely to demonstrate that, contrary to its court arguments, Citynet has recognized that, under the plain language of the Plan, Mr. Toney and other plan participants who voluntarily terminate their employment are entitled to redeem the vested balance of their performance units.  Citynet has asserted that it was improper for the circuit court to review this letter in ruling on Mr. Toney's motion for partial summary judgment. We disagree.  The letter constitutes an admission that was properly considered by the trial court.  "Rule 56(c) [of the West Virginia Rules of Civil Procedure] expressly authorizes a trial court to consider . . . admissions . . . ."  Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 56(c)[d], at 1224 (4th ed. 2012).  In this regard, Rule 56(c) states, in relevant part, "[t]he judgment sought shall be rendered forthwith if the . . . admissions on file, . . . if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See also* W. Va. R. E. 801(d)(2) (providing that an opposing party's statement is not heresay).

impermissibly entered summary judgment against it before any discovery was conducted.

Citynet submits that, in granting partial summary judgment to Mr. Toney, the circuit court

considered the Plan without the benefit of deposition testimony by Citynet's Board regarding

their interpretation of the Plan. Similarly, contends Citynet, its Board was not deposed

regarding the significance of additional documents considered by the circuit court in granting

partial summary judgment to Mr. Toney. Citynet's arguments fail on two grounds.

First, as noted above, the language of the Plan is plain and unambiguous. *See*

Syl. pt. 3, *Kanawha Banking and Trust Co. v. Gilbert*, 131 W. Va. 88, 46 S.E.2d 225 (1947)

("When a written contract is clear and unambiguous its meaning and legal effect must be

determined solely from its contents and it will be given full force and effect according to its

plain terms and provisions. Extrinsic evidence of the parties to such contract, or of other

persons, as to its meaning and effect will not be considered."). Because the Plan contract

language is plain and unambiguous, the circuit court was bound to apply, not construe, its

terms. Therefore, it would have been improper for the circuit court to consider extrinsic

evidence presented by Citynet for the purposes of interpreting the Plan.[9]

_____

[9]The circuit court stated in its order granting partial summary judgment to Mr. Toney:

> 5.    The plain and unambiguous language of subsection 5.7(a) of the Incentive Plan states that it applies to employment terminations without cause, and the provision contains no language whatsoever stating that

(continued...)

22

A second and more significant reason for rejecting Citynet's argument that the circuit court should have allowed it to conduct discovery before granting partial summary judgment to Mr. Toney is that Citynet failed to request discovery. Citynet correctly notes that

> [s]ummary judgment is appropriate only after the non-moving party has enjoyed "adequate time for discovery." *Celotex Corp*.[ *v. Catrett*], 477 U.S. [317,] 322, 106 S. Ct. [2548,] 2552[, 91 L. Ed. 2d 265 (1986)]; *Anderson*[ *v. Liberty Lobby, Inc.*], 477 U.S. [242,] 250 n.5, 106 S. Ct. [2505,] 2511 n.5[, 91 L. Ed. 2d 202 (1986)]. As this Court has recognized, summary judgment prior to the completion of discovery is "precipitous." *Williams*[ *v. Precision Coil, Inc.*], 194 W. Va. [52,] 61, 459 S.E.2d [329,] 338 [(1995)], quoting *Board of Educ. of the County of Ohio v. Van Buren and Firestone, Arch., Inc.*, 165 W. Va. 140, 144, 267 S.E.2d 440, 443 (1980).

*Payne's Hardware & Bldg. Supply, Inc. v. Apple Valley Trading Co. of W. Va.*, 200 W. Va. 685, 690, 490 S.E.2d 772, 777 (1997). However, Citynet has failed to recognize that,

> [w]here a party is unable to resist a motion for summary judgment because of an inadequate opportunity to conduct discovery, that party should file an affidavit pursuant to W. Va. R. Civ. P. 56(f) and obtain a ruling thereon by the trial court. *Such affidavit and ruling thereon, or other evidence that the question of a premature summary judgment motion was presented to and decided by the trial court, must be included in*

[9](...continued)
its application is limited to terminations by the employer only.

6. The plain and unambiguous language of subsection 5.7(a) of the Incentive Plan applies equally to terminations without cause by the employee and the employer, and neither the parties nor this Court can now interject additional restrictive language into subsection 5.7(a).

*the appellate record to preserve the error for review by this Court.*

*Crain v. Lightner*, 178 W. Va. 765, 364 S.E.2d 778 (1987) (emphasis added). *Accord* Syl. pt. 3, *Payne's Hardware*, 200 W. Va. 685, 490 S.E.2d 772. Moreover, this court has explained that,

> [i]n *Williams*, we stated that "subject to the conditions of Rule 56(g), we believe a continuance of a summary judgment motion is mandatory upon a good faith showing by an affidavit that the continuance is needed to obtain facts essential to justify opposition to the motion." 194 W. Va. at 61-62, 459 S.E.2d at 338-39, footnote added. In syllabus point three of *Williams*, we stated as follows:
>
>> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.
>
> Where a party fails to avail himself of the relief granted through Rule 56(f), "it is generally not an abuse of discretion for a circuit court to rule on a motion for summary judgment." *Id*. at 62, 459 S.E.2d at 339. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 241-42 (4th Cir.1995), quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2nd Cir.1994) ("failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate"). In *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954 (4th Cir.1996), the Fourth Circuit held that "the nonmoving

24

party cannot complain that summary judgment was granted without discovery unless that party made an attempt to oppose the motion on the grounds that more time was needed for discovery or moved for a continuance to permit discovery before the [trial] court ruled." *Id.* at 961. As we have often explained, "[t]he law ministers to the vigilant, not those who slumber on their rights." *Powderidge* [*Unit Owners Ass'n v. Highland Properties, Ltd.*], 196 W. Va. [692,] 703, 474 S.E.2d [872,] 883 [(1996)], quoting *Banker v. Banker*, 196 W. Va. 535, 547, 474 S.E.2d 465, 477 (1996), citing *Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir.1987).

*Payne's Hardware*, 200 W. Va. at 690-91, 490 S.E.2d at 777-78 (footnote omitted). Because

Citynet failed to request discovery and submit an affidavit explaining the need for further

discovery, the circuit court committed no error in granting partial summary judgment to Mr.

Toney without discovery.

### C. Timely Payment Provision of the Wage Payment and Collection Act

Under section 5.7(a) of the Plan, which we have found to be applicable to Mr.

Toney, "[a]ny amounts due will be paid in accordance with the Payout Schedule of the Plan."

The "Payout Schedule" is found in paragraph 5.8, which provides:

Payout Schedule. For all valid redemption requests, as defined in the Plan, the Company shall use commercially reasonable efforts to pay any amounts due, less normal withholdings, to the Participant within ninety (90) days of such redemption request. If the Company fails to pay the amounts due to a Participant within the ninety (90) day period, the remaining balance shall be converted to an unsecured debt of the Company, the Company shall record the Participant as a lender to the Company, and the Company shall accrue interest at a rate

25

of five percent (5%) per annum. Provided, however, in the event of a redemption request when the Company Equity Value is negative, the Company shall have ninety (90) days after the Company Equity Value is positive to pay any amounts due.

Citynet failed to pay any amount to Mr. Toney in response to the request he made in connection with his voluntary termination of his employment.

The circuit court applied the WPCA and ruled that, due to Citynet's failure to pay Mr. Toney in compliance with W. Va. Code § 21-5-4(c), Citynet was liable to Mr. Toney for three times the amount of his vested performance units as liquidated damages and that Citynet also was liable for reasonable attorney's fees and costs. *See* W. Va. Code § 21-5-4(e) (2006) (Repl. Vol. 2008)[10] & W. Va. Code § 21-5-12(b) (1975) (Repl. Vol. 2013).[11]

---

[10]Pursuant to W. Va. Code § 21-5-4(e) (2006) (Repl. Vol. 2008),

[i]f a person, firm or corporation fails to pay an employee wages as required under this section, the person, firm or corporation, in addition to the amount which was unpaid when due, *is liable to the employee for three times that unpaid amount as liquidated damages*. Every employee shall have a lien and all other rights and remedies for the protection and enforcement of his or her salary or wages, as he or she would have been entitled to had he or she rendered service therefor in the manner as last employed; except that, for the purpose of liquidated damages, the failure shall not be deemed to continue after the date of the filing of a petition in bankruptcy with respect to the employer if he or she is adjudicated bankrupt upon the petition.

(Emphasis added).

[11]W. Va. Code § 21-5-12(b) (1975) (Repl. Vol. 2013) provides that

(continued...)

Citynet argues that the timely payment provisions of the WPCA cannot be applied to payments under the Plan; therefore, the circuit court erred by concluding that Mr. Toney was entitled to treble damages and attorney's fees. Reasoning that Mr. Toney had no right to a payment under the Plan that "accrued" immediately upon his quitting, Citynet contends that it is entitled to specify the terms upon which it would pay Mr. Toney's bonus, such as within ninety days after he made a valid request if the Board chose to do so. Quoting from *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 215-17, 530 S.E.2d 676, 688-90 (1999), Citynet observes that "when fringe benefits are part of a compensation package, they are governed by the terms of employment," not the WPCA.

Mr. Toney responds that the timely payment provisions of the WPCA should be applied to payments under the Plan, and he is, therefore, entitled to treble damages and attorney's fees. Mr. Toney notes that it is undisputed that his performance units were 100% vested. He asserts that, because the WPCA protects, as "wages," fringe benefits that have accumulated, vested, and are capable of calculation, and because his benefits meet these qualifications, Citynet was obligated to pay the same upon the termination of his employment. Therefore, Mr. Toney argues, Citynet's failure to pay his vested benefits

---

[11](...continued)

> [t]he court in any action brought under this article may, in the event that any judgment is awarded to the plaintiff or plaintiffs, assess costs of the action, including reasonable attorney fees against the defendant.

entitled him to liquidated damages under the WPCA.

We begin our analysis by examining the WPCA. Thus, we note at the outset that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). However, it is not always within this Court's province to construe a statute: "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959). "A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Hereford v. Meek*, 132 W. Va. 373, 386, 52 S.E.2d 740, 747 (1949). Clearly, "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992).

Having set out some basic standards for our analysis of the WPCA, we turn our attention to the Act itself. The legislative purpose for the WPCA is well established:

> "'The West Virginia Wage Payment and Collection Act
> is remedial legislation designed to protect working people and

28

assist them in the collection of compensation wrongly withheld.'
Syllabus, *Mullins v. Venable*, 171 W. Va. 92, 297 S.E.2d 866
(1982)." Syl. Pt. 3, *Jones v. Tri-County Growers, Inc.*, 179
W. Va. 218, 366 S.E.2d 726 (1988).

Syl. pt. 7, *Grim v. Eastern Elec., LLC*, No. 13-1133, ___ W. Va. ___, ___ S.E.2d ___, 2014

WL 5800677 (Nov. 3, 2014). Because it is remedial legislation, the WPCA must be

construed liberally in order to accomplish the purposes for which it was intended. *See State*

*ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 777, 461 S.E.2d 516,

523 (1995) ("Where an act is clearly remedial in nature, we must construe the statute liberally

so as to furnish and accomplish all the purposes intended." (citations omitted)). *Accord*

*Adkins v. American Mine Research, Inc.*, ___ W. Va. ___, ___, 765 S.E.2d 217, 220 (2014);

*Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. at 215, 530 S.E.2d at 688.


To determine whether the circuit court correctly applied the WPCA under the

circumstances presented in this case, we first note that the WPCA provides a time frame for

payment of wages to an employee who quits or resigns:

> Whenever an employee quits or resigns, the person, firm
> or corporation shall pay the employee's wages no later than the
> next regular payday, either through the regular pay channels or
> by mail if requested by the employee, except that if the
> employee gives at least one pay period's notice of intention to
> quit the person, firm or corporation shall pay all wages earned
> by the employee at the time of quitting.

29

W. Va. Code § 21-5-4(c) (2006) (Repl. Vol. 2008).[12]  The foregoing language is

straightforward in setting the time frame for an employer[13] to pay wages to an employee who

quits or resigns.  Plainly, where an employee like Mr. Toney resigns without a lengthy notice,

wages must be paid "no later than the next regular payday."  W. Va. Code § 21-5-4(c).  The

question, then, is whether Mr. Toney's vested performance units are "wages" subject to

W. Va. Code § 21-5-4(c).

> Notably, the WPCA includes certain fringe benefits within the meaning of the

term "wages":

> the term "wages" shall. . . include *then accrued fringe benefits*
> *capable of calculation and payable directly to an employee*:
> Provided, That nothing herein contained shall require fringe
> benefits to be calculated contrary to any agreement between an
> employer and his employees which does not contradict the

---

[12]This quote is from the 2006 version of the statute, which is the version that applies to this case.  W. Va. Code § 21-5-4(c) was amended in 2013.  The amendments appear to clarify the statutory language and make no substantive change:

> Whenever an employee quits or resigns, the person, firm or corporation shall pay the employee's wages in full no later than the next regular payday. Payment shall be made through the regular pay channels or, if requested by the employee, by mail. However, if the employee gives at least one pay period's written notice of intention to quit, the person, firm or corporation shall pay all wages earned by the employee at the time of quitting.

W. Va. Code § 21-5-4(c) (2013) (Repl. Vol. 2013).

[13]Pursuant to W. Va. Code § 21-5-1(m) (1987) (Repl. Vol. 2013), "[t]he term 'employer' means any person, firm or corporation employing any employee."

30

provisions of this article.

W. Va. Code § 21-5-1(c) (emphasis added).  The term "fringe benefit" is defined in the

WPCA to mean

> *any benefit provided an employee or group of employees by an employer*, or which is required by law, *and includes* regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, *production incentive bonuses*, sickness and accident benefits and benefits relating to medical and pension coverage.

W. Va. Code § 21-5-1(*l*) (emphasis added).


Based upon these statutory definitions, we find that Mr. Toney's vested

performance units granted under the Plan are a type of "wages" contemplated by the WPCA.

The vested performance units clearly are a benefit provided to Mr. Toney and other Citynet

employees by Citynet, and, therefore, they fall within the statutory definition of a "fringe

benefit" set out in W. Va. Code § 21-5-1(*l*).  Moreover, W. Va. Code § 21-5-1(*l*) presents a

nonexclusive list of examples of the types of benefits that are contemplated by the

Legislature to be "fringe benefits."  In this regard, the statute provides that the term "'fringe

benefits' . . . includes . . . production incentive bonuses."  The Legislature's use of the word

"includes" to introduce the list of fringe benefits in W. Va. Code § 21-5-1(*l*) reveals that the

list is not intended to be an exclusive list.  This Court has recognized that

> [i]t is obvious that the Legislature . . . meant for the word "includes" to be given its common, ordinary and accepted meaning, which is that of a word of enlargement.  *Davis*

> *Memorial Hospital*[ *v. West Virginia State Tax Comm'r*], 222
> W. Va. [667,] 684, 671 S.E.2d [682,] 689 [(2008)] ("[t]he term
> 'includ[es]' in a statute is to be dealt with as a word of
> enlargement").

*Shepherdstown Observer, Inc. v. Maghan*, 226 W. Va. 353, 359, 700 S.E.2d 805, 811 (2010).

Thus, to the extent that the Plan is similar to a "production incentive bonus[]," it is among those types of fringe benefits contemplated by the Legislature in W. Va. Code § 21-5-1(*l*). We find the Plan is, indeed, similar to a production incentive bonus. The Plan certainly is an incentive bonus. The title of the Plan is "Employee Incentive Plan." The expressly stated purpose of the Plan, delineated in paragraph 1.1, is "to create incentives which are designed to motivate Participants . . . to put forth maximum effort toward the success and growth of the Company and to enable the Company to attract and retain experienced individuals who by their position, ability and diligence are able to make important contributions to the company's success." This language demonstrates that the Plan is similar to a production incentive bonus insofar as it is plainly intended to motivate employees to work toward the growth and success of the company, and to remain employed by Citynet. Thus, the Plan is a "fringe benefit" as defined in W. Va. Code § 21-5-1(*l*).

We next must determine whether the Plan's performance units are a fringe benefit that qualify as a "wage" under W. Va. Code § 21-5-1(c). This Court previously has discussed at length the language of W. Va. Code § 21-5-1(c) as it relates to fringe benefits. The definitive case on this issue is *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530

S.E.2d 676. The *Meadows* opinion addressed five consolidated cases involving employees who were seeking to collect payment for unused sick leave or vacation pay upon separation from their employment. The issue addressed in *Meadows* was "whether the [WPCA] requires employers to pay employees unused sick leave or vacation pay in the same manner as wages, regardless of the terms of the applicable employment policy, upon separation from employment." In deciding this issue, the *Meadows* Court first observed an ambiguity in the concept of "then accrued fringe benefits" as used in W. Va. Code § 21-5-1(c). *Meadows*, 207 W. Va. at 214, 530 S.E.2d at 687. After observing that, "[a]ccording to W. Va. Code § 21–5–1(c), only fringe benefits which are 'then accrued,' 'capable of calculation,' and 'payable directly to an employee' are included in the term 'wages,'" the *Meadows* Court concluded that "the proper definition of the word 'accrued' in W. Va. Code § 21–5–1(c) is 'vested.'" *Meadows*, 207 W. Va. at 215, 530 S.E.2d at 688. The Court then explained that

> [t]he concept of vesting is concerned with expressly enumerated conditions or requirements all of which must be fulfilled or satisfied before a benefit becomes a presently enforceable right. Because the WPCA contains no such conditions or requirements, the payment of fringe benefits can only be governed by the terms of employment found in employment policies promulgated by employers and agreed to by employees.

*Meadows*, 207 W. Va. at 215-16, 530 S.E.2d at 688-89. Based upon this analysis, the *Meadows* Court held that,

> [p]ursuant to W. Va. Code § 21-5-1(c) (1987), whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term

"wages" are determined by the terms of employment and not by the provisions of W. Va. Code § 21-5-1(c). Further, the terms of employment may condition the vesting of a fringe benefit right on eligibility requirements in addition to the performance of services, and these terms may provide that unused fringe benefits will not be paid to employees upon separation from employment.

*Meadows*, 207 W. Va. at 206, 530 S.E.2d at 679.[14]

Relying on the language in *Meadows* that recognizes an employer may condition the vesting of a fringe benefit right on some eligibility requirement in addition to the performance of services and may provide that unused fringe benefits will not be paid to employees upon separation from employment, Citynet contends that "in order to prevail on his claim of immediate entitlement to the value of his Performance Units, Mr. Toney would have to show entitlement to that amount under the express terms of the Plan." *Citing Wolfe v. Adkins*, 229 W. Va. 31, 38, 725 S.E.2d 200, 207 (2011) ("[T]here must be an 'express

---

[14]A similar issue was recently addressed in *Adkins v. American Mine Research, Inc.*, ___ W. Va. ___, 765 S.E.2d 217 (2014). The *Adkins* Court addressed whether an unwritten policy on the payment of commissions that was based upon custom and practice could be used to determine whether a fringe benefit was a "wage" pursuant to W. Va. Code § 21–5–1(c). Based, in part, on this Court's holding in *Meadows*, the *Adkins* Court held that

> [t]he determination as to whether "wages," as defined in West Virginia Code § 21–5–1(c) (2013 Repl. Vol.), are payable pursuant to the requirements of West Virginia Code § 21–5–1 *et seq*. (2013 Repl. Vol.) is governed by the terms of the employment agreement, whether written or in the form of a consistently applied unwritten policy.

Syl. pt. 5, *Adkins,* ___ W. Va. ___, 765 S.E.2d 217.

agreement' between employer and employee that the employee is entitled to payment of a fringe benefit upon separation from employment.").

Citynet fails to appreciate that the ability of an employer to "condition the vesting of a fringe benefit right on eligibility requirements," or to decline to pay unused fringe benefits "to employees upon separation from employment," *does not* allow an employer to fail to pay *vested fringe benefits* to an employee upon separation from employment. In this regard, the *Meadows* Court observed that "W. Va. Code § 21-5-1(c) simply means that *if under the terms of employment an employee is entitled to the payment of fringe benefits, the payment of these benefits has the same status as unpaid wages*." *Meadows*, 207 W. Va. at 216, 530 S.E.2d at 689 (emphasis added; footnote omitted). *Cf. Robertson v. Opequon Motors, Inc.*, 205 W. Va. 560, 568, 519 S.E.2d 843, 851 (1999) (per curiam) ("The Act does not demand that an employer offer vacation pay. However, if an employer offers paid vacation, *the Act requires an employer to pay it when an employee has earned it under the terms of the employment agreement*." (Emphasis added)).

As explained above in Section III.A.2. of this opinion, upon voluntarily terminating his employment, Mr. Toney became entitled to redeem the entirety of his vested performance units under section 5.7(a) of the Plan. In other words, under the terms of the Plan, Mr. Toney's vested performance units were accrued, capable of calculation, and

35

payable directly to him. Accordingly, Mr. Toney's vested performance units are "wages" pursuant to W. Va. Code § 21-5-1(c).

Citynet argues, however, that the payout provision of the Plan, which allows Citynet ninety days in which to comply with a Plan participant's valid redemption request made under section 5.7(a),[15] removes the Plan from the WPCA because, under the terms of the Plan, payment of the vested performance units is not due at the time of separation. Citynet misunderstands the proper application of the WPCA. While an employee's *entitlement* to wages is determined by the terms of employment, the *timeliness of the payment* of such wages upon an employee's separation from employment is firmly within the purview of the WPCA.

---

[15]The Plans' payout schedule states:

5.8    Payout Schedule. For all valid redemption requests, as defined in the Plan, the Company shall use commercially reasonable efforts to pay any amounts due, less normal withholdings, to the Participant within ninety (90) days of such redemption request. If the Company fails to pay the amounts due to a Participant within the ninety (90) day period, the remaining balance shall be converted to an unsecured debt of the Company, the Company shall record the Participant as a lender to the Company, and the Company shall accrue interest at a rate of five percent (5%) per annum. Provided, however, in the event of a redemption request when the Company Equity Value is negative, the Company shall have (90) days after the Company Equity Value is positive to pay any amounts due.

36

With respect to the voluntary separation of an employee from his or her employment, the version of the WCPA in effect at the time relevant to Mr. Toney[16] provides:

> (c) Whenever an employee quits or resigns, the person, firm or corporation *shall pay the employee's wages no later than the next regular payday*, either through the regular pay channels or by mail if requested by the employee, except that if the employee gives at least one pay period's notice of intention to quit the person, firm or corporation shall pay all wages earned by the employee at the time of quitting.

W. Va. Code § 21-5-4(c) (emphasis added). The Legislature's use of the term "shall" demonstrates that this provision is mandatory.

> "'It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation.' Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W. Va. 445, 300 S.E.2d 86 (1982)." Syllabus point 1, *E.H. v. Matin*, 201 W. Va. 463, 498 S.E.2d 35 (1997).

Syl. pt. 7, *J.A. St. & Assocs., Inc. v. Thundering Herd Dev., LLC*, 228 W. Va. 695, 724 S.E.2d 299 (2011). Accordingly, when Mr. Toney resigned from his employment without giving one pay period's notice, W. Va. Code § 21-5-4(c) placed upon Citynet a mandatory duty to pay Mr. Toney's vested performance units "no later than the next regular payday."

Citynet's attempt to circumvent the WPCA by implementing its payout schedule of ninety days is of no avail. The WPCA expressly directs that,

---

[16]*See supra* note 12.

> [e]xcept as provided in section thirteen [§ 21-5-13], *no provision of this article may in any way be contravened or set aside by private agreement*, and the acceptance by an employee of a partial payment of wages shall not constitute a release as to the balance of his claim and any release required as a condition of such payment shall be null and void.

W. Va. Code § 21-5-10 (1975) (Repl. Vol. 2013) (emphasis added).[17] Thus, to the extent that the payout provision of the Plan contravenes the WPCA as it applies to employees who are separating from their employment, the WPCA governs. This Court previously has refused to enforce an agreement between an employer and an employee to pay wages outside the time frame set forth in the WPCA.

In the case of *Britner v. Medical Security Card, Inc.*, 200 W. Va. 352, 489 S.E.2d 734 (1997) (per curiam), three employees were hired by the defendant employer in 1990 under a contract that entitled them to an annual fifteen percent raise. The company never paid the employees their raises. In 1995, the employees voluntarily ended their employment and sued the employer to recover their unpaid annual raises. The employer argued that the employment contracts had been modified by the employees' agreement to defer the raises until the company was profitable. Accordingly, the employer argued that the employees' suit was barred by the doctrine of estoppel. The circuit court rejected the employer's argument and granted summary judgment to the employees. The employer

---

[17]W. Va. Code § 21-5-13 (1975) (Repl. Vol. 2013) authorizes the commissioner to make rules and regulations.

appealed. This Court affirmed the circuit court's ruling based upon W. Va. Code § 21-5-10.

After concluding that the unpaid raises were "wages," this Court reasoned that

> estoppel is not a defense which can be successfully asserted to bar an action pursuant to W. Va. Code § 21-5-10 (1996).
>
>  . . . .
>
> The legislature has attempted to prevent employers from abusing their positions by compromising the wages of employees. The language in W. Va. Code § 21–5–10 is mandatory. An employer must pay earned wages to its employees. Any other reading would seriously compromise and undermine the legislative intent of W. Va. Code § 21–5–10. Therefore, we affirm the circuit court's summary judgment ruling.

*Britner*, 200 W. Va. at 354-55, 489 S.E.2d at 736-37. By finding that the doctrine of estoppel could not be utilized to bar the plaintiffs' action under the WPCA, this Court necessarily found that an employment agreement may not adopt a payment schedule for earned wages that violates the WPCA.

The United States Court of Appeals for the Fourth Circuit also has interpreted the West Virginia WPCA and concluded that "the WPCA regulates the timing of payment of wages." *Gregory v. Forest River, Inc.*, 369 F. App'x 464, 469 (4th Cir. 2010) (unpublished decision). The *Gregory* opinion involved the timeliness of an employer's payment of earned commissions to an employee whose employment had been terminated by the employer. According to the *Gregory* Court, the employer terminated Mr. Gregory's

39

employment on July 13, 2007, and issued his commission payments in accordance with its policy, which did not fully comply with the timing of the WPCA. Under its policy, FRI, the employer,

> paid Gregory his June commission as scheduled on July 20, 2007. Thereafter, FRI paid Gregory commissions for the months of July-November ("the post-discharge commissions") on the dates scheduled . . .; thus, FRI paid Gregory commissions on August 17 (July commission), September 21 (August commission), October 19 (September commission), November 16 (October commission), and December 21 (November commission).

*Gregory*, 369 F. App'x at 466-67. The Fourth Circuit found that some of these payments violated the WPCA's requirement that a discharged employee be paid "wages in full within seventy-two hours." W. Va. Code § 21-5-4(b) (2006) (Repl. Vol. 2008).[18] Specifically, the *Gregory* Court held that, notwithstanding FRI's policy to the contrary,

> FRI violated the WPCA by failing to pay Gregory his June commissions (which were earned on units that shipped during June) within 72 hours of his termination. Further, we hold that FRI violated the WPCA by failing to pay Gregory his full July commissions for units that shipped (and were thus earned) by July 13, 2007, within 72 hours.

---

[18]W. Va. Code § 21-5-4(b) was amended in 2013 and now provides that an employer who discharges an employee "shall pay the employee's wages in full no later than the next regular payday or four business days, whichever comes first." W. Va. Code § 21-5-4(b) (2013) (Repl. Vol. 2013).

Although this particular provision of the WPCA is not applicable to Mr. Toney insofar as he was not discharged by Citynet, the Fourth Circuit's rationale regarding the applicability of the time requirements of the WPCA are equally persuasive to our analysis of the time requirements of W. Va. Code § 21-5-4(c).

*Gregory*, 369 F. App'x at 469. In reaching this conclusion, the Fourth Circuit explained that

> [w]e do not agree with FRI that its commission payment schedule (as reflected in [its policy]) relates to when commissions are *earned*; rather, it simply establishes when they are to be *paid*. Because the WPCA mandates payments of earned wages within 72 hours of discharge, FRI's reliance on the payment schedule, and its consequential payment of the June commissions and the early July commissions more than 72 hours after termination, runs afoul of the WPCA.

*Gregory*, 369 F. App'x at 469-70.

The same reasoning applies to the instant case. The ninety-day time frame established in the payout schedule of Citynet's Plan pertains to when performance units are *paid*, not when they are *earned*. Because the ninety-day time frame for payment set out in the Plan exceeds that which is allowed by W. Va. Code § 21-5-4(c), it may not be enforced.

Citynet further asserts that the circuit court's order applied the ninety-day payout provision of the Plan and assessed liquidated damages under the WPCA because Citynet failed to pay Mr. Toney's vested performance units within ninety days of his request. We do not interpret the circuit court's order in this manner. The circuit court's order plainly states that "Citynet failed to pay Mr. Toney his wages as required by the WV-WPCA and Citynet is therefore liable to Mr. Toney for liquidated damages as defined by Section 21-5-

4(e) of the WV-WPCA."[19]  However, in reviewing the circuit court's order, we do find that it ordered that "Citynet shall be liable to Mr. Toney for statutory interest on the wages beginning ninety (90) days after his written redemption request on October 12, 2011." Based upon our finding that the ninety-day payout provision of the Plan is unenforceable, we conclude that the circuit court erred in ordering statutory interest to begin at the expiration of that ninety-day period.  Under W. Va. Code § 21-5-4(c), Citynet was mandated to pay Mr. Toney's vested performance units no later than the next regular payday following his resignation.  Therefore, statutory interest shall begin on that date, and the circuit court erred in ruling otherwise.

To summarize our conclusions, because the payment of Mr. Toney's fringe benefit, that is, his vested performance units, has the same status as unpaid wages under the WPCA, payment of the same was required to comply with the terms of the WPCA.  In other

---

[19]Even were we to agree with Citynet's interpretation of the circuit court's order, we would, nevertheless, affirm the circuit court's ruling that Citynet violated the WPCA.  We simply would do so on grounds different from those relied upon by the circuit court.  *See* Syl. pt. 3, *Barnett v. Wolfolk*, 149 W. Va. 246, 140 S.E.2d 466 (1965) ("This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment."). *See also State v. Lockhart*, 208 W. Va. 622, 636 n.15, 542 S.E.2d 443, 457 n.15 (2000) ("The fact that the circuit court may have rejected Dr. Coffey's testimony for reasons different than those expressed in this opinion is of no consequence."); *State v. Boggess*, 204 W. Va. 267, 276, 512 S.E.2d 189, 198 (1998) ("Consequently, it is apparent that the trial court made the right ruling for the wrong reason . . . .  Hence, even though, contrary to the trial court's reasoning, . . . the evidence still was properly excluded.").

words, following Mr. Toney's resignation, Citynet was required to pay Mr. Toney his vested performance units "no later than the next regular payday" pursuant to W. Va. Code § 21-5-4(c). By failing to pay Mr. Toney his vested performance units in accordance with W. Va. Code § 21-5-4(c), Citynet violated the WPCA. Therefore, we affirm the circuit court's ruling that Citynet violated the WPCA, its award of treble damages pursuant to W. Va. Code § 21-5-4(e),[20] and its award of attorney's fees and costs under W. Va. Code § 21-5-12(b) (1975) (Repl. Vol. 2013).[21] However, we reverse the circuit court's award of statutory interest beginning ninety days after Mr. Toney's written redemption request. Instead, interest shall accrue from the date of the next regular payday following Mr. Toney's resignation on October 12, 2011.

### D. Amount of Mr. Toney's Vested Benefits

Following the circuit court's order granting summary judgment to Mr. Toney, Citynet filed a motion seeking, *inter alia*, to have the circuit court's award of $87,000.48 to Mr. Toney reduced by $17,400.10, the amount Mr. Toney admittedly had received from his vested balance of $87,000.48, and to have the liquidated damages award reduced accordingly. The circuit court denied the motion on the ground that it was untimely presented. We disagree.

---

[20]See *supra* note 10 for relevant text of W. Va. Code § 21-5-4(e).

[21]See *supra* note 11 for relevant text of W. Va. Code § 21-5-12(b).

Mr. Toney concedes that the evidence he presented to the circuit court to establish the vested amount of his performance units was inaccurate. This evidence was presented to the circuit court in the form of a letter stating that his vested balance as of January 1, 2010, was $87,000.48. Nevertheless, he further concedes that *it is undisputed* that, after January 1, 2010, he requested and received a payment from his vested balance in the amount of $17,400.10. Mr. Toney asserts that his vested balance *should* exceed $87,000.48 due to performance units that would have been awarded in January 2011, prior to his resignation. However, his attempt to assign a value to any performance units granted in January 2011 is mere speculation. Mr. Toney has made no attempt to ascertain the true value of his performance units and, instead, presented to the circuit court an amount he knew to be incorrect.

Under these circumstances, particularly where the litigation before the circuit court focused on whether or not summary judgment was proper, the circuit court erred in refusing to allow Citynet to seek a reduction in the amount of the circuit court's award. *See, e.g., Beasley v. Pelmore*, 259 Ill. App. 3d 513, 522, 631 N.E.2d 749, 756 (1994) ("[A]fter hearing defendant's post-trial motion, the court granted a reduction in the damages for the $22,000 received by plaintiff[.]"). Allowing Mr. Toney to recover $17,400.10 that he has already received, and to allow treble damages to be calculated based upon an erroneous amount, would amount to a windfall for Mr. Toney. Accordingly, the circuit court's award

to Mr. Toney of $87,000.48, is reduced to $69,600.38. In addition, the circuit court's liquidated damages award to Mr. Toney in the amount of $261,001.44, is reduced to three times $69,600.38, or $208,801.14.

## IV.

## CONCLUSION

Based upon the foregoing analysis, we conclude that the circuit court did not err in granting partial summary judgment to Mr. Toney. The circuit court correctly found that Mr. Toney was entitled to payment of his vested balance in the Plan. In addition, the circuit court correctly applied the WPCA and awarded liquidated damages, costs, and attorney's fees in accordance therewith. We, therefore, affirm the circuit court's orders on these grounds. However, we find that the circuit court did err in setting the date from which prejudgment interest would accrue. Therefore, we affirm, in part, and reverse, in part, the Circuit Court of Kanawha County's order of September 18, 2012. We further find that the circuit court erred in failing to grant Citynet's post-judgment motion to the extent that it sought to offset the circuit court's award by $17,400.10 that Mr. Toney had previously received from his Employee Incentive Plan account. Accordingly, we reverse that portion of the November 20, 2012, order of the Circuit Court of Kanawha County. Mr. Toney is hereby awarded $69,600.38 as payment for his vested balance in the Plan. Additionally, pursuant to W. Va. Code § 21-5-4(e), Mr. Toney is awarded three times that amount, which

45

is $208,801.14, as liquidated damages.

Affirmed, in part, and Reversed, in part.